727 N.E.2d 1003 (2000)
191 Ill.2d 37
245 Ill.Dec. 269
In re G.O., a Minor (The People of the State of Illinois, Appellant,
v.
G.O., Appellee).
No. 87476.
Supreme Court of Illinois.
March 23, 2000.
*1005 James E. Ryan, Attorney General, Springfield, Richard A. Devine, State's Attorney, Chicago (William L. Browers, Assistant Attorney General, Chicago, Renee G. Goldfarb, Kenneth T. McCurry and Susan R. Schierl, Assistant State's Attorneys, of counsel), for the People.
Donald J. Mizerk and Craig O. Donaldson, Winston & Strawn, Chicago, for Appellee.
Amicus Curiae Rita A. Fry, Public Defender, Chicago (Elizabeth E. Clarke, of counsel).
Steven A. Drizin, Chicago, Adnan Arian, Beth A. Colgan, L. Kate Mitchell and Kate W. Shank, law students, for amicus curiae Northwestern University Legal Clinic.
Justice RATHJE delivered the opinion of the court:
The State appeals from an order of the appellate court holding that respondent, G.O., is entitled to a jury trial and that respondent's confession was involuntary. See 304 Ill.App.3d 719, 237 Ill.Dec. 717, 710 N.E.2d 140. We vacate the appellate court's holding that respondent is entitled to a jury trial and reverse the holding that respondent's confession was involuntary.

BACKGROUND
The State, relying upon a theory of accountability, filed a petition in the circuit court of Cook County to adjudicate respondent delinquent for the first degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 1998)) of Rafael Kubera. Respondent also faced related allegations of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 1998)), aggravated battery (720 ILCS 5/12-4(a) (West 1998)), and aggravated battery with a firearm (720 ILCS 5/12-4.2(a)(1) (West 1998)). Respondent requested a jury trial. The trial court denied respondent's request. Respondent also sought to suppress incriminating statements that he had made. After a hearing, the trial court denied this motion.
Subsequently, the trial court adjudicated respondent delinquent on all charges. Pursuant to section 5-33(1.5) of the Juvenile Court Act of 1987 (705 ILCS 405/5-33(1.5) (West 1996) (now 705 ILCS 405/5-750(2) (West 1998))), the trial court declared respondent a ward of the court and ordered him committed to the Department of Corrections, Juvenile Division, until his "21st birthday, without the possibility of parole, furlough, or non-emergency authorized absence for a period of 5 years." See 705 ILCS 405/5-33(1.5) (West 1996). Respondent timely appealed.
The appellate court held that the trial court denied respondent his right to equal protection as guaranteed by the federal and state constitutions (see U.S. Const., amend. XIV; Ill. Const.1970, art. I, § 2) when it denied his request for a jury trial. *1006 The court explained that the sentence to which respondent was subject was similar to the sentences imposed upon habitual and violent juvenile offenders.[1] Compare 705 ILCS 405/5-33(1.5) (West 1996) with 705 ILCS 405/5-35(f) (West 1996) (now 705 ILCS 405/5-815(f) (West 1998)) (requiring a habitual juvenile offender to be committed to the Department of Corrections, Juvenile Division, "until his 21st birthday, without possibility of parole, furlough, or non-emergency authorized absence") and 705 ILCS 405/5-36(f) (West 1996) (now 705 ILCS 405/5-820(f) (West 1998)) (requiring a violent juvenile offender to be committed to the Department of Corrections, Juvenile Division, "until his or her 21st birthday, without possibility of parole, furlough, or non-emergency authorized absence"). The court described all three sentences as "punitive, determinate, nondiscretionary sentences of commitment to the age of 21 without hope of parole or furlough for at least five years from the date of commitment." 304 Ill.App.3d at 727, 237 Ill.Dec. 717, 710 N.E.2d 140. The court reasoned that the similar sentences rendered respondent similarly situated to habitual and violent juvenile offenders. Notwithstanding the fact that the three are similarly situated, the Juvenile Court Act treats juveniles charged with first degree murder differently than it treats juvenile offenders and violent juvenile offenders. Specifically, the Juvenile Court Act grants a jury trial to both habitual and violent juvenile offenders, but it does not grant such a right to juveniles charged with first degree murder. See 705 ILCS 405/5-35(d), 5-36(d) (West 1996). The appellate court concluded that no rational basis existed for granting a jury trial to habitual and violent juvenile offenders while denying one to juveniles charged with first degree murder. 304 Ill.App.3d at 727-29, 237 Ill.Dec. 717, 710 N.E.2d 140.
The appellate court also examined the evidence that had been presented at the suppression hearing and concluded that the trial court erred in denying respondent's motion to suppress. Subsequently, the State sought leave to appeal, both as a matter of right and as a matter of discretion (see 177 Ill.2d R. 315; 134 Ill.2d R. 317).[2] We granted the State's petition and ordered that the action be considered on an expedited basis. We also granted the motions of the Cook County public defender and the Children and Family Justice Center to file briefs as amici curiae.

ANALYSIS

Equal Protection
We address first the State's argument that the appellate court erred in concluding that the trial court's refusal to grant respondent a jury trial denied him the equal protection of the laws. The basis for the appellate court's opinion is the similar sentences imposed on juveniles adjudicated delinquent of first degree murder and those imposed on juveniles adjudicated delinquent as habitual and violent juvenile offenders. See 304 Ill.App.3d at 727, 237 Ill.Dec. 717, 710 N.E.2d 140.
*1007 The sentencing provision for juveniles charged with first degree murder is found at section 5-33(1.5). This section was enacted as part of Public Act 88-680 (Pub. Act 88-680, eff. January 1, 1995), commonly known as the Safe Neighborhoods Law. In People v. Cervantes, 189 Ill.2d 80, 243 Ill.Dec. 233, 723 N.E.2d 265 (1999), this court held that the General Assembly violated the single subject clause of the Illinois Constitution (Ill. Const.1970, art. IV, § 8(d)) when it enacted Public Act 88-680. When an act is held unconstitutional in its entirety, it is void ab initio; the state of the law is as if the act had never been passed. People v. Tellez-Valencia, 188 Ill.2d 523, 525, 243 Ill.Dec. 191, 723 N.E.2d 223 (1999); see also People v. Gersch, 135 Ill.2d 384, 390, 142 Ill.Dec. 767, 553 N.E.2d 281 (1990). Thus, respondent is no longer subject to a mandatory sentencing requirement. Instead, he is now treated similarly to all juvenile offenders except habitual and violent juvenile offenders. Because respondent is unquestionably not similarly situated to habitual and violent juvenile offenders, we have no basis upon which to conclude that the trial court's denial of respondent's request for a jury trial denied respondent the equal protection of the law.

Due Process
Respondent argues that, even if he is not entitled to a jury trial as a matter of equal protection, both the federal and state constitutions guarantee him such a right both as a matter of due process and as a matter of the constitutionally guaranteed right to a jury trial. See U.S. Const., amends. VI, XIV; Ill. Const.1970, art. I, §§ 2, 8. Both this court and the Supreme Court have previously rejected such arguments. See McKeiver v. Pennsylvania, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971); People ex rel. Carey v. Chrastka, 83 Ill.2d 67, 46 Ill.Dec. 156, 413 N.E.2d 1269 (1980); In re Fucini, 44 Ill.2d 305, 255 N.E.2d 380 (1970). Respondent urges us to reconsider these decisions in light of the fact that the mandatory minimum sentence required by section 5-33(1.5) renders the process to which respondent is subject much more punitive than rehabilitative. Here, however, respondent is no longer subject to the mandatory minimum sentence, and respondent has given us no other reason to reexamine our earlier decisions.[3] Consequently, we must reject respondent's argument.
Because the law underlying the appellate court's judgment has now been rendered void, we must vacate the appellate court's judgment holding that respondent was denied his equal protection rights when the trial court denied his request for a new trial.

Respondent's Motion to Cite Supplemental Authority and the State's Reply Brief to the Briefs of the Amici Curiae

After this court issued its opinion in Cervantes, respondent sought leave to cite Cervantes as additional authority. In section II of this motion, respondent asserts that the legislature has reenacted the mandatory sentencing provision for juveniles charged with first degree murder (see 705 ILCS 405/5-750(2) (West 1998)). Respondent contends that, because this provision has been reenacted, this court should, because of the "great public interest," decide whether a juvenile charged with first degree murder is entitled to a jury trial.
Similarly, the State, in its reply brief to the briefs of the amici curiae, devotes approximately a third of its brief to discussing the effect of Cervantes. The State argues that (1) because of the reenactment of the sentencing provision, we should address whether juveniles charged with first degree murder are entitled to a jury trial; *1008 and (2) respondent is subject to the reenacted sentencing provision even though it was not effective until after the events forming the foundation of the finding of delinquency occurred. Subsequently, respondent moved to strike the State's reply brief. We ordered that motion taken with the case.
This court's rules governing appeals provide, "The reply brief, if any, shall be confined strictly to replying to arguments presented in the brief of the appellee * * *." (Emphasis added.) 177 Ill.2d R. 341(g). The first third of the State's reply brief addresses issues contained within neither respondent's brief nor the briefs of the amici curiae, which were filed in support of the respondent's position. Because argument I of the State's brief violates Rule 341(g), we grant respondent's motion in part and strike argument I of the State's brief. In so doing, we note that if the State wished to brief these issues, it should have sought leave from this court to do so.
We turn now to respondent's argument. Respondent concedes that he is no longer subject to the mandatory sentencing requirements. He argues, however, that this court should issue what would in effect be an advisory opinion deciding whether, under the reenacted version of the sentencing provision for juveniles found delinquent of first degree murder, juveniles are entitled to a jury trial. Aside from the question of whether respondent should have raised this issue earlier,[4] we note that respondent's argument contains no citation to any authority that would permit this court to issue such an advisory opinion. Because respondent has failed to cite any authority to support his argument, we find it waived. See 177 Ill.2d R. 341(e)(7); People v. Franklin, 167 Ill.2d 1, 20, 212 Ill.Dec. 153, 656 N.E.2d 750 (1995).

Voluntariness of Respondent's Confession

Standard of Review
We turn now to whether defendant's confession was voluntary. Before addressing the merits of this issue, we must first determine the proper standard of review. The State argues that we cannot reverse the trial court's ruling denying defendant's motion to suppress unless the court's conclusion is against the manifest weight of the evidence. The appellate court, finding that neither the facts nor the credibility of the witnesses was at issue, reviewed the trial court's ruling de novo. See 304 Ill. App.3d at 730, 237 Ill.Dec. 717, 710 N.E.2d 140. Respondent argues that, regardless of which standard of review is applied, the trial court erred in denying respondent's motion to suppress. Nevertheless, respondent contends that de novo review is appropriate because "[o]nly the State's witnesses presented evidence with respect to the alleged statements and the immediate surrounding circumstances."
Traditionally, this court has held that, when an appellate court reviews a trial court's ruling on a defendant's motion to suppress involuntary statements, the appellate court should affirm the trial court's judgment unless the judgment was manifestly erroneous. See People v. Oaks, 169 Ill.2d 409, 447, 215 Ill.Dec. 188, 662 N.E.2d 1328 (1996) ("this court has never departed from the `manifestly erroneous' standard in reviewing the denial of a defendant's motion to suppress based upon the voluntariness of a confession"). In Oaks, however, this court reviewed the ruling de novo because the record contained both a videotape and a transcript of the interrogation. Oaks, 169 Ill.2d at 447, 215 Ill. Dec. 188, 662 N.E.2d 1328.
After this court decided Oaks, the Supreme Court held that, when an appellate *1009 court reviews rulings on a motion to suppress involving questions of probable cause and reasonable suspicion, the reviewing court should review de novo the findings with respect to probable cause and reasonable suspicion. Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911, 920 (1996). The Court explained that de novo review was justified for three reasons. First, "independent appellate review of these ultimate determinations of reasonable suspicion and probable cause is consistent with the position we have taken in past cases." Ornelas, 517 U.S. at 697, 116 S.Ct. at 1662, 134 L.Ed.2d at 919. Second, "the legal rules for probable cause and reasonable suspicion acquire content only through application. Independent review is therefore necessary if appellate courts are to maintain control of, and to clarify, the legal principles." Ornelas, 517 U.S. at 697, 116 S.Ct. at 1662, 134 L.Ed.2d at 919. Third, "de novo review tends to unify precedent and will come closer to providing law enforcement officers with a defined `set of rules which, in most instances, makes it possible to reach a correct determination beforehand as to whether an invasion of privacy is justified in the interest of law enforcement.'" Ornelas, 517 U.S. at 698, 116 S.Ct. at 1662, 134 L.Ed.2d at 919, quoting New York v. Belton, 453 U.S. 454, 458, 101 S.Ct. 2860, 2863, 69 L.Ed.2d 768, 773 (1981). The Court cautioned, however, that findings of historical fact should be reviewed only for clear error and that reviewing courts must give due weight to inferences drawn from those facts by the fact finder. Ornelas, 517 U.S. at 699, 116 S.Ct. at 1663, 134 L.Ed.2d at 920.
Thereafter, the United States Court of Appeals, Seventh Circuit, held that "Ornelas requires that the ultimate question of whether a confession is voluntary is a matter of law that must be reviewed de novo." United States v. D.F., 115 F.3d 413, 419 (7th Cir.1997). In reaching this conclusion, the court noted that the same factors that the Supreme Court found dispositive in Ornelas apply equally to questions of voluntariness. First, the Supreme Court has traditionally treated the question of the voluntariness of a confession as a question of law. D.F., 115 F.3d at 418, citing Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); Miller v. Fenton, 474 U.S. 104, 110, 106 S.Ct. 445, 449, 88 L.Ed.2d 405, 411 (1985); see also Haynes v. Washington, 373 U.S. 503, 515-16, 83 S.Ct. 1336, 1344, 10 L.Ed.2d 513, 522 (1963). Second, the term voluntariness "is certainly given content through case-by-case adjudication, an adjudication tempered by the discipline of traditional common-law methodology. When employed as a constitutional standard of adjudication, it presents a very definite need for uniformity of meaning and consistency of application." D.F., 115 F.3d at 417. Third, the court explained that the question of whether a confession is voluntary "`turns as much on whether the techniques for extracting the statements, as applied to this suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means as on whether the defendant's will was in fact overborne.'" (Emphasis omitted.) D.F., 115 F.3d at 418, quoting Miller, 474 U.S. at 116, 106 S.Ct. at 452-53, 88 L.Ed.2d at 414-15. Given this, the "unification of precedent by appellate courts is especially important because it comes closer to providing law enforcement officers with a set of rules upon which they can act with the assurance that they are not going beyond the pale of the Constitution." D.F., 115 F.3d at 417. Because the factors used in Ornelas apply equally to questions of the voluntariness of a confession, the Seventh Circuit concluded that "Ornelas requires that the ultimate question of whether a confession is voluntary is a matter of law that must be reviewed de novo." D.F., 115 F.3d at 419. In reaching this conclusion, the court, like the Supreme Court in Ornelas, emphasized that "the determination of the historical facts of the case are the proper domain of the trial court and that our review of its *1010 findings in that regard will be for clear error." D.F., 115 F.3d at 419. Notably, virtually every other federal court of appeals agrees with this conclusion. See United States v. Tompkins, 130 F.3d 117, 120 n. 10 (5th Cir.1997) (citing cases from numerous federal appellate courts and noting that the question of whether a confession is voluntary "is uniformly held to be subject to de novo review").
After reviewing Ornelas and D.F., we agree with the Seventh Circuit that the decision in Ornelas applies equally to questions of the voluntariness of a confession and that the federal appellate courts and the Supreme Court review de novo the question of the voluntariness of a confession. The question facing us is whether we should adopt the same standard.
First, we note that this court has followed Ornelas. See People v. Wardlow, 183 Ill.2d 306, 311, 233 Ill.Dec. 634, 701 N.E.2d 484 (1998), rev'd on other grounds, 528 U.S. ___, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). Thus, this court has already found persuasive the principles relied on in Ornelas. After considering this fact and reviewing the above cases, we believe that the same principles apply to our review of the voluntariness of a confession. A de novo standard of review ensures that our courts of review maintain and clarify the legal principals governing confessions. This, in turn, allows our reviewing courts to develop a uniform body of precedent that will enable police officers to determine, before attempting to obtain confession, what behavior is constitutionally permissible.
Consequently, in reviewing whether respondent's confession was voluntary, we will accord great deference to the trial court's factual findings, and we will reverse those findings only if they are against the manifest weight of the evidence. However, we will review de novo the ultimate question of whether the confession was voluntary. We caution that, for this standard of review to function as it is intended, trial courts must exercise their responsibility to make factual findings when ruling on motions to suppress. Reviewing courts should not be required to surmise what factual findings that the trial court made. Instead, the trial court should make clear any factual findings upon which it is relying. It is only through this synergy between the trial and reviewing courts that appellate courts can develop a uniform body of precedent to guide law enforcement officers in their determination of whether their actions may violate the constitution.

Evidence Relating to Respondent's Confession
At the hearing on respondent's motion, Detective Edward Cunningham testified that he first saw respondent at approximately 11 p.m. on the day of the shooting. At that time, respondent was under arrest and was sitting in an interview room measuring approximately 10 by 15 feet. Cunningham did not believe that respondent was handcuffed. At approximately 12:15 a.m., Cunningham called respondent's mother and told her that respondent was at the police station "in regards to a homicide investigation" and that he would like her to come to the station. Respondent's mother appeared reluctant to come to the station and stated that she was not sure that she could get transportation. She also told Cunningham that, if she came to the station, she "would probably kill [respondent]" and she "wouldn't get the truth out of [respondent]."
Cunningham next contacted Youth Officer Alicia Ayala. At approximately 12:30 a.m., Cunningham and Ayala spoke with respondent. Cunningham advised respondent of his Miranda rights and then asked him what had happened that evening. Respondent stated that he had been riding in a van with some friends when they saw a person named Alfredo Nunez, also known as Weedo. Nunez joined respondent and his companions. After going to a restaurant, respondent and his companions took Nunez home. After taking this statement, *1011 Cunningham left and spoke with other investigators.
At approximately 3:30 a.m., Cunningham again spoke with respondent, this time with Youth Officer Cecil Jefferson present. Cunningham again informed respondent of his Miranda rights. Cunningham then told respondent that he did not believe that, during their first conversation, respondent had told him everything that had happened that evening. Respondent then told Cunningham that he was in a van with three other individuals. They picked up Nunez, who told them that he "wanted to get some Popes[5] because they had been messing with him a couple days earlier." Nunez told the driver to go to the Archer Park area to search for some Popes. After circling the area, they saw some Popes in the park. Nunez instructed the driver to park within a block or two of the park. Nunez also told the others in the rear of the van to hand him a gun from a hiding spot. Upon receiving the gun, Nunez stated that he was going to "pop some Popes."
After the van was parked, respondent and Nunez exited the van and began walking toward the park. Respondent and Nunez became separated by several feet when respondent paused to urinate. As the two approached the Popes, one of the Popes, speaking toward respondent, questioned, "Who is the nig[g]er." Respondent replied, "Maniacs," which he explained meant Maniac Latin Disciples.
The Popes began chasing respondent, and he ran toward where Nunez was standing. As respondent neared Nunez, respondent saw Nunez shoot at the Popes. Respondent turned to look at the Popes, and he heard Nunez fire several more shots. Respondent then shouted, "Pope killers," and he and Nunez returned to the van. They then drove to Nunez's house, where Nunez hid the gun and respondent discarded the used shell casings in the garbage.
About the time that respondent finished relating the account, his mother arrived at the station. Cunningham took her to see respondent. Cunningham then told respondent:
"I'm going to explain everything to your mother in front of you that happened this evening and that you told me what happened. If I say anything that isn't the truth, you stop me."
Respondent did not stop Cunningham at anytime during his description of the evening's occurrences.
Cunningham did not recall that respondent had been handcuffed at any of the times he saw respondent that night. Cunningham admitted, however, that he did not know for sure that respondent had not been handcuffed. Cunningham also stated that he did not remember respondent going to the bathroom, getting something to eat, or getting something to drink.
Assistant State's Attorney Michael O'Malley testified that at approximately 3 a.m. he spoke with respondent in the presence of Ayala and Cunningham. At that time, respondent was not handcuffed. After advising respondent of his rights, O'Malley questioned respondent about what had happened that night. Respondent told him that Nunez had a gun and was going to Archer Park to shoot some Popes. The description of the shooting was consistent with Cunningham's testimony.
Ayala testified that, when she asked Cunningham if respondent's parents had been notified, Cunningham told her, "The parent had been notified and the parent refused to come down." When Ayala first saw respondent at approximately 12:30 a.m., he was not handcuffed, and he had a can of soda in front of him. After the initial interview was over, respondent requested to use the bathroom and the officers allowed him to do so.
During the 3 a.m. interview, Ayala saw respondent receive a second can of soda, *1012 and she noticed that he was not handcuffed. Following this interview, respondent again asked to go to the bathroom, and he was allowed to go.
Respondent's mother testified that when Cunningham told her that respondent was at the police station, she told him, "I am on my way. I am on public transportation, but I am on my way." She admitted that she said that she was going to kill respondent, but she explained that this was just an expression of her unhappiness that respondent was in Chicago when he was not supposed to be there. She denied that she said that she could not get the truth from him. During cross-examination, respondent's mother testified that respondent is a smart child who was doing "very well" in school.
At the conclusion of the hearing, the trial court found that respondent was in custody for approximately two hours before he was questioned, that Cunningham had notified respondent's mother before he began questioning respondent, and that Cunningham informed respondent of his Miranda rights before questioning began. The court further found that the questioning had occurred in the presence of a youth officer and that respondent, who is a "very intelligent man," had "no problem" understanding his Miranda rights. The court emphasized that, between the times that respondent was questioned, he had ample time in which to contemplate what he was saying and to ask questions about his rights or anything else that was happening. Nevertheless, respondent made no such inquiries. Respondent was never physically or mentally abused, was not handcuffed, never requested an attorney, was allowed to use the bathroom, and was provided with soda. The court stated that "no coercive environment was ever attached to the minor respondent." The court then denied respondent's motion.

Governing Law
In determining whether a confession was voluntary, we must consider the totality of the circumstances. People v. Gilliam, 172 Ill.2d 484, 500, 218 Ill.Dec. 884, 670 N.E.2d 606 (1996). Factors to consider include the respondent's age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning; the legality and duration of the detention; the duration of the questioning; and any physical or mental abuse by police, including the existence of threats or promises. Gilliam, 172 Ill.2d at 500-01, 218 Ill.Dec. 884, 670 N.E.2d 606. Significantly, no single factor is dispositive. Gilliam, 172 Ill.2d at 500, 218 Ill.Dec. 884, 670 N.E.2d 606. The test of voluntariness is whether the respondent "made the statement freely, voluntarily, and without compulsion or inducement of any sort, or whether the [respondent's] will was overcome at the time he or she confessed." Gilliam, 172 Ill.2d at 500, 218 Ill.Dec. 884, 670 N.E.2d 606.
Additionally, we have recognized that the taking of a juvenile's confession is "a sensitive concern." People v. Prude, 66 Ill.2d 470, 476, 6 Ill.Dec. 689, 363 N.E.2d 371 (1977). Because of this, the "greatest care" must be taken to assure that the confession was not coerced or suggested and that "`it was not the product of ignorance of rights or of adolescent fantasy, fright or despair.'" People v. Simmons, 60 Ill.2d 173, 180, 326 N.E.2d 383 (1975), quoting In re Gault, 387 U.S. 1, 55, 87 S.Ct. 1428, 1458, 18 L.Ed.2d 527, 561 (1967); see also Prude, 66 Ill.2d at 476, 6 Ill.Dec. 689, 363 N.E.2d 371. Because of this concern, the appellate court has also recognized an additional factor that is not present in cases involving adults. This factor, commonly known as the "concerned adult" factor, considers whether the juvenile, either before or during the interrogation, had an opportunity to consult with an adult interested in his welfare. See In re L.L., 295 Ill.App.3d 594, 600-01, 230 Ill. Dec. 430, 693 N.E.2d 908 (1998); In re S.D.S., 103 Ill.App.3d 1008, 1012, 59 Ill. Dec. 258, 431 N.E.2d 759 (1982). Other facets to this factor include whether the *1013 police prevented the juvenile from conferring with a concerned adult and whether the police frustrated the parents' attempt to confer with the juvenile. L.L., 295 Ill. App.3d at 601, 230 Ill.Dec. 430, 693 N.E.2d 908; In re J.J.C., 294 Ill.App.3d 227, 235, 228 Ill.Dec. 751, 689 N.E.2d 1172 (1998). The State devotes several pages of its brief to arguing that this factor is based on erroneous statutory interpretation and that the appellate court has erred by turning this factor into a per se rule requiring the suppression of a juvenile's confession if he is denied the ability to confer with a concerned adult either before or during his interrogation. Nevertheless, during oral argument, the State conceded that whether a juvenile is able to confer with a parent or other concerned adult can be a relevant factor to consider when determining whether a juvenile's confession is voluntary.
We agree with the State that a juvenile's confession should not be suppressed simply because he was denied the opportunity to confer with a parent or other concerned adult before or during the interrogation. Nevertheless, we believe that this is a factor that may be relevant in determining whether a juvenile's confession was voluntary. This is particularly true in situations in which the juvenile has demonstrated trouble understanding the interrogation process, he asks to speak with his parents or another "concerned adult," or the police prevent the juvenile's parents from speaking with him. While not dispositive, this is one of many factors to be examined when determining whether a juvenile's confession was voluntary.
Turning to the facts of this case, we conclude that the totality of the circumstances indicates that respondent's confession was voluntary. Weighing against admission are respondent's young age and the fact that he has had no previous contact or experience with the justice system. Although respondent was not provided with an opportunity to confer with a concerned adult, the testimony revealed that respondent never requested to do so, and the police never frustrated any attempt by respondent's mother to confer with him. Significantly, Cunningham phoned respondent's mother before he questioned respondent. Although he did not tell respondent's mother that respondent was under arrest, Cunningham explained that, when he spoke with her, he did not know that respondent was involved in the shooting.
The other factors weigh in favor of admission. First, respondent's detention was valid. Moreover, the evidence demonstrates that the authorities repeatedly informed respondent of his Miranda rights and that respondent understood those rights.[6] Respondent's mother testified that he was intelligent and did very well in school. Although respondent was in the police station for several hours, he was questioned for only a short period of time on only three or four occasions. Additionally, the trial court found that respondent was not handcuffed and that he was provided soda and access to the bathroom upon request. Respondent concedes that no physical coercion occurred, and the testimony revealed no evidence of any threats or promises. Thus, while we believe that the taking of a juvenile's confession is a sensitive concern and that care must be taken to ensure that the confession is voluntary, we believe that the totality of the circumstances indicates that respondent's confession was the result of his own decision and not the result of compulsion or his will being overborne.
Amicus curiae Cook County public defender urges us to adopt a per se rule that minors tried as adults must consult with counsel before waiving their Miranda *1014 rights. Because the cause before us involves only a minor tried as a juvenile and not a minor tried as an adult, we decline to address this argument.
Amicus curiae Children and Family Justice Center argues that this court should (1) create a per se rule requiring that minors must have an opportunity to consult with a parent, guardian, or attorney before the police can interrogate the minor; and (2) require that all interrogations of minors be videotaped. With respect to the first issue, we have already determined that the ability of a juvenile to consult with a concerned adult is one of many factors that courts must consider when determining whether a confession is voluntary. However, we see no basis in the law to conclude that this single factor should be dispositive.
With respect to the videotaping of confessions, we believe that this is a policy question that is best left to the General Assembly and individual police departments. While we have no doubt that the presence of a videotape would assist a court in determining whether a confession is voluntary (see, e.g., Oaks, 169 Ill.2d at 447-48, 215 Ill.Dec. 188, 662 N.E.2d 1328), the constitution does not require that a confession be videotaped to be admissible at trial.

Sufficiency of the Evidence
Respondent contends that, without his confession, the evidence is insufficient to sustain the finding of delinquency. Respondent does not argue that the evidence is insufficient if his confession is considered. Because we have determined that the trial court properly admitted defendant's confession, we need not address this issue.

CONCLUSION
Because respondent is not subject to a mandatory determinate sentence, we must vacate the appellate court's holding that the trial court violated respondent's equal protection rights by denying his request for a jury trial. Moreover, because the trial court believed that it had to impose a mandatory determinate sentence, we must vacate the disposition and remand this cause to the trial court so that it may impose a disposition consistent with the applicable law.
Additionally, we reverse the appellate court's judgment that respondent's confession was involuntary and affirm the trial court's denial of defendant's motion to suppress.
Appellate court judgment vacated in part and reversed in part; circuit court judgment affirmed in part and vacated in part; cause remanded.
Justice HEIPLE, dissenting:
Someone once posed the following hypothetical question to Abraham Lincoln. "If you call a tail a leg, how many legs does a dog have?" Lincoln answered, "Four. Calling a tail a leg doesn't make it one." In a similar vein, calling delinquency proceedings at which a juvenile could be sentenced to multiple years in the Department of Corrections noncriminal doesn't make it so.
In the case at hand, the State filed a petition to adjudicate G.O., a 13-year-old juvenile, delinquent based on charges of first degree murder, aggravated discharge of a firearm, aggravated battery and aggravated battery with a firearm. The trial court denied G.O.'s request for a jury trial and adjudicated G.O. delinquent on all charges. The trial court declared G.O. a ward of the court and, under the sentencing provision in the Juvenile Court Act for first degree murder, committed G.O. to the Department of Corrections, Juvenile Division, until his "21st birthday, without the possibility of parole, furlough, or non-emergency authorized absence for a period of 5 years." See 705 ILCS 405/5-33(1.5) (West 1996).
The appellate court reversed, holding the failure to provide G.O. with a jury trial *1015 violated his right to equal protection because the General Assembly provides jury trials for juveniles charged as either violent or habitual juvenile offenders which carry similar mandatory minimum sentences. The majority reverses and holds that G.O. does not have a constitutional right to a jury trial because the mandatory minimum sentencing provision for first degree murder was declared unconstitutional in People v. Cervantes, 189 Ill.2d 80, 243 Ill.Dec. 233, 723 N.E.2d 265 (1999) (holding Public Act 88-680, which contained the sentencing provision for first degree murder, violated the single subject clause of the Illinois Constitution). The majority concludes that Cervantes resolves G.O.'s constitutional challenge to the denial of his request for a jury trial. 191 Ill.2d at 43, 245 Ill.Dec. at 280, 727 N.E.2d at 1014. I disagree. G.O. has a right to a jury trial under article I, section 8, of the Illinois Constitution even if he is not subject to the mandatory minimum sentence in section 5-33(1.5) of the Juvenile Court Act. Therefore, I respectfully dissent.
Article I, section 8, of the Illinois Constitution of 1970 provides that "[i]n criminal prosecutions, the accused shall have the right to * * * a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed." Ill. Const.1970, art. I, § 8. Delinquency proceedings have all the hallmarks of a criminal prosecution. The basis of the charge of delinquency is the commission of a criminal offense, and, if found delinquent, a juvenile can be incarcerated in the Department of Corrections until he is 21 years old.[7] This is a classic case of crime and punishment.
In past decisions, this court has emphasized that delinquency proceedings are not criminal in nature because the overriding concern of these proceedings is rehabilitation, not punishment. See, e.g., In re Beasley, 66 Ill.2d 385, 389, 6 Ill.Dec. 202, 362 N.E.2d 1024 (1977); In re W.C., 167 Ill.2d 307, 320, 212 Ill.Dec. 563, 657 N.E.2d 908 (1995). The prior analysis on this issue is flawed, however, because it relied on an outmoded characterization of the juvenile justice system. Much has changed in the last three decades since the United States Supreme Court refused to extend the right to a jury trial to juvenile delinquency proceedings on the grounds that the jury trial "will remake the juvenile proceeding into a fully adversary process and will put an effective end to what has been the idealistic prospect of an intimate, informal protective proceeding." McKeiver v. Pennsylvania, 403 U.S. 528, 545, 91 S.Ct. 1976, 1986, 29 L.Ed.2d 647, 661 (1970). Rehabilitation no longer occupies its once preeminent status in the juvenile *1016 justice system; punishment and public safety are now the juvenile justice system's overriding concerns. The statement of purpose and policy in the Illinois Juvenile Court Act evinces this shift:
"It is the intent of the General Assembly to promote a juvenile justice system capable of dealing with the problem of juvenile delinquency, a system that will protect the community, impose accountability for violations of law and equip juvenile offenders with competencies to live responsibly and productively. To effectuate this intent, the General Assembly declares the following to be important purposes of this Article:
(a) To protect citizens from juvenile crime.
(b) To hold each juvenile offender directly accountable for his or her acts.
(c) To provide an individualized assessment of each alleged and adjudicated delinquent juvenile, in order to rehabilitate and to prevent further delinquent behavior through the development of competency in the juvenile offender." 705 ILCS 405/5-101 (West 1998).
Rehabilitation remains an important aspect of the juvenile justice system, but the same is true of the adult criminal justice system.[8] However one chooses to characterize the purpose of the juvenile justice system, the fact remains that "the incarcerated juveniles' liberty * * * is restrained just as effectively as that of the adult inmates serving terms in State and Federal prisons." In re Urbasek, 38 Ill.2d 535, 541, 232 N.E.2d 716 (1967).
In addition to this shift in fundamental purpose, virtually all of the constitutional requirements of an adversary criminal trial have been imported into juvenile delinquency proceedings. These requirements include the right to adequate notice of charges, the right to counsel, the privilege against self-incrimination and the right to confront and cross-examine witnesses. In re W.C., 167 Ill.2d at 320-21, 212 Ill.Dec. 563, 657 N.E.2d 908. Moreover, the State must prove delinquency beyond a reasonable doubt. In re Urbasek, 38 Ill.2d at 541-42, 232 N.E.2d 716. In fact, juveniles have "all the procedural rights of adults in criminal proceedings" except the right to a jury trial. 705 ILCS 405/5-101(3) (West 1998); see also 705 ILCS 405/5-605(1) (West 1998) ("All delinquency proceedings shall be heard by the court except those proceedings under this Act where the right to trial by jury is specifically set forth").
The majority rejects G.O.'s argument that juveniles have a constitutional right to a jury trial in delinquency proceedings under the Illinois Constitution, holding such an argument is foreclosed by this court's decision in In re Fucini, 44 Ill.2d 305, 255 N.E.2d 380 (1970). Fucini, however, is distinguishable because that case interpreted the jury trial provision under the 1870 Constitution, which has no bearing on the issue in this case. In Fucini, the juvenile challenged the General Assembly's failure to provide a right to a jury trial in delinquency proceedings under the jury trial provision in the Illinois Constitution of 1870, which stated that "[t]he right of trial by jury as heretofore enjoyed, shall remain inviolate." (Emphasis added.) Ill. Const. 1870, art. II, § 5. The Fucini court reasoned that the juvenile was not entitled to a jury trial because the common law, at the time of the adoption of the 1870 Constitution, did not provide for such a right. Fucini, 44 Ill.2d at 310, 255 N.E.2d 380, citing Lindsay v. Lindsay, 257 Ill. 328, 100 N.E. 892 (1913). The holding in Fucini has no bearing on G.O.'s argument in this case because the jury trial provision in the 1970 Constitution, unlike its analogue in *1017 the 1870 Constitution, does not require that the right to a jury trial exist at common law prior to 1870.[9]
In Beasley, the court implied that recognizing a juvenile delinquency proceeding as a criminal prosecution would lead to the abandonment of the intimate, informal protective proceeding of the juvenile justice system altogether. In re Beasley, 66 Ill.2d at 390, 6 Ill.Dec. 202, 362 N.E.2d 1024. This fear was unwarranted when Beasley was decided in 1977, and it is even more so now. The incorporation of virtually every aspect of criminal procedure (except the jury trial) into juvenile proceedings has not undermined the justification for separate adult and juvenile justice systems. Moreover, the right to a jury trial has already been incorporated into the juvenile justice system for certain specific offenses. See 705 ILCS 405/5-815(d), 5-820(d) (West 1998) (providing right to jury trial for habitual and violent juvenile offenders). The failure to provide the right to a jury trial in delinquency proceedings should not be treated as a method of shielding the juvenile defendant from the adult criminal justice system. Rather, it should be recognized that most attributes of the adult criminal justice system are already permanent features of the juvenile justice system. A juvenile, no less than an adult, is entitled to the protection of a jury trial when faced with incarceration in the Illinois Department of Corrections. The failure to provide a jury trial should be seen for what it truly is: an anachronism and a denial of equal justice for all.
For the reason stated above, I respectfully dissent.
Justice McMORROW, also dissenting:
I dissent from the majority's holding that the circuit court did not err in admitting G.O's confession, since the confession was "the result of his own decision and not the result of compulsion or his will being overborne." 191 Ill.2d at 57, 245 Ill.Dec. at 279, 727 N.E.2d at 1013. I do not believe that the confession was voluntarily and knowingly given by G.O. and therefore cannot agree that G.O.'s confession was properly admitted at trial. The constellation of facts in the instant case does not demonstrate that G.O., under the totality of the circumstances, confessed either voluntarily or with an understanding of the consequences of his confession. The majority unreasonably assumes that a child of 13 is capable of making an intelligent waiver of his constitutional rights. I do not adopt that assumption and therefore I respectfully dissent.
The totality of the circumstances surrounding a confession is to be considered in the determination of whether a juvenile confessed to a crime following a knowing and voluntary waiver of his Miranda rights. Fare v. Michael C., 442 U.S. 707, 724, 99 S.Ct. 2560, 2571, 61 L.Ed.2d 197, 212 (1979); People v. Simmons, 60 Ill.2d 173, 179, 326 N.E.2d 383 (1975). The age, education, experience and background of a juvenile are to be examined, as well as "whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." Fare, 442 U.S. at 725, 99 S.Ct. at 2572, 61 L.Ed.2d at 212. In its analysis, the court should also consider the youth's physical condition, the existence of threats, promises or physical coercion, whether the minor was informed of his constitutional rights, the duration of the interrogation and whether the confession was the product of police deception. People v. Gilliam, 172 Ill.2d 484, 500-01, 218 Ill.Dec. 884, 670 N.E.2d 606 (1996); People v. Martin, 102 Ill.2d 412, 426-27, 80 Ill.Dec. 776, 466 N.E.2d 228 (1984); see People v. Prude, 66 *1018 Ill.2d 470, 475-76, 6 Ill.Dec. 689, 363 N.E.2d 371 (1977). Perhaps the most critical element in the totality of the circumstances is the admonition by the United States Supreme Court that, in the absence of legal counsel to advise a juvenile before or during the interrogation, "the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." (Emphasis added.) In re Gault, 387 U.S. 1, 55, 87 S.Ct. 1428, 1458, 18 L.Ed.2d 527, 561 (1967); see also People v. Prude, 66 Ill.2d at 476, 6 Ill.Dec. 689, 363 N.E.2d 371 ("[T]he receiving of an incriminating statement by a juvenile is a sensitive concern").
In the case at bar, the majority enumerates the factors that lead it to conclude that G.O. confessed voluntarily and knowingly. My colleagues focus on the Miranda warnings read to G.O., the youth's alleged intelligence, and the fact that he was never overtly threatened or harmed. The majority relies too on the absence of handcuffs in the interrogation room, and the presence of a youth officer. That G.O. was permitted to drink soda and use the washroom also removed the specter of coercion, according to the majority. The majority further contends that there was no attempt to frustrate contact between G.O. and his mother.
I do not agree with the majority's reliance upon several of these factors. In particular, the majority fails to give sufficient emphasis to G.O.'s very young age. Facts that lead to one conclusion concerning the custodial interrogation of an adult can compel an entirely different conclusion when applied to the interrogation of a child. When reviewed with "the greatest care" (In re Gault, 387 U.S. at 55, 87 S.Ct. at 1458, 18 L.Ed.2d at 561), and when truly mindful of G.O.'s tender years, the circumstances of G.O.'s confession lead ineluctably to the conclusion that his statements should have been suppressed.
At the time of the murder, G.O. was just one month past his thirteenth birthday. He was arrested late at night (between 10:15 and 10:45 p.m.) and brought to a police station. He had never been arrested before. No parent or other familiar person was with him. He was placed in an interrogation room, and left alone until approximately 12:30 a.m., when he was questioned by a detective and a youth officer. During this initial conversation with the authorities, G.O. did not admit involvement in the murder. He was questioned again at 3 and 3:30 a.m., by a variable combination of a youth officer, a prosecutor, and a police detective. He was never asked to sign a written waiver of his constitutional rights and no written account of his confession was ever submitted to G.O. for his review.
There is no indication in the record that G.O. had ever been in a police station before his arrest. Thus, he was presumably unfamiliar with the environment of a police station. For example, police frequently walk through the station wearing police uniforms, displaying badges signaling authority, and their service weapons and handcuffs are in plain sight. G.O., a boy barely in his teens, with no record of previous criminal involvement and no familiarity with police stations, was placed alone in a police station interrogation room, a climate inherently intimidating to a thirteen year old. Miranda v. Arizona, 384 U.S. 436, 457, 86 S.Ct. 1602, 1618-19, 16 L.Ed.2d 694, 713-14 (1966). The coercion of the situation was compounded by interrogation, over a several hour period, by authority figures who were unknown to him. Too, the interrogation of G.O. continued in the absence of any person he knew, or in the absence of any person who at least appeared to affirmatively intervene on his behalf. See Haley v. Ohio, 332 U.S. 596, 599-600, 68 S.Ct. 302, 304, 92 L.Ed. 224, 228 (1948). The questioning occurred in the very early hours of the morning, and there is no evidence of record to suggest that G.O. slept during his custody at the *1019 police station, or whether he was fatigued at the time he allegedly confessed to his role in the shooting.
Individuals of greater age and experience could find these same circumstances overwhelming and coercive. To a boy of G.O's youth and presumed naivete, these circumstances could be sufficiently overpowering as to raise a genuine doubt whether any confession made in this atmosphere would be the product of a free will. In Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948), a fifteen-year-old criminal defendant confessed to committing murder, after a five-hour interrogation by police. The Supreme Court suppressed the confession. Haley, 332 U.S. at 601, 68 S.Ct. at 304, 92 L.Ed. at 229. While the facts of Haley are distinguishable from the facts in the instant appeal, the Haley Court explained why confessions yielded by juveniles must be scrutinized particularly closely:
"[W]hen, as here, a mere child-an easy victim of the law-is before us, special care in scrutinizing the record must be used. Age 15 is a tender and difficult age for a boy of any race. He cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens. This is the period of great instability which the crisis of adolescence produces. A 15-year-old lad, questioned through the dead of night by relays of police, is a ready victim of the inquisition. Mature men possibly might stand the ordeal from midnight to 5 a.m. But we cannot believe that a lad of tender years is a match for the police in such a contest. He needs counsel and support if he is not to become the victim first of fear, then panic. He needs someone on whom to lean lest the overpowering presence of the law, as he knows it, crush him. No friend stood at the side of this 15-year-old boy as the police, working in relays, questioned him hour after hour, from midnight until dawn.
No lawyer stood guard to make sure that the police went so far and no farther, to see to it that they stopped short of the point where he became the victim of coercion. No counsel or friend was called during the critical hours of questioning." Haley, 332 U.S. at 599-600, 68 S.Ct. at 304, 92 L.Ed. at 228-29.
In the case at bar, certain "findings" of the trial court, undisputed and relied upon by the majority, lack any evidentiary support in the record. For example, the trial court "found" that G.O. had ample opportunity to "contemplate" his statements during the several hours he was held at the police station (191 Ill.2d at 54, 245 Ill.Dec. at 278, 727 N.E.2d at 1012), and that he never used this time to ask questions or assert his rights. I do not believe that a boy who had only very recently reached his thirteenth birthday, who was alone and in unfamiliar surroundings, possesses, or should be expected to possess, the maturity and understanding to use the several hours he was under arrest to ask questions and assert his constitutional rights. There is no explanation by the trial court or in the record to support this finding. Probably there is no explanation. The alleged period of "contemplation" was more likely a period that amplified the fears naturally borne of such a coercive atmosphere. The prolonged periods of isolation between the interrogations predictably reinforced the intimidation inherent in the surroundings, thereby undermining G.O.'s will and the voluntariness of his confession.
The trial court reached the untenable conclusion that, because G.O. was not handcuffed, G.O. was not subject to coercion. Testimony adduced before the trial court showed that G.O. was not free to leave the station; he had been arrested and was in police custody. The police did not need to handcuff G.O. to make it clear to him that he was not free to move at will.
Further, there is an insufficient basis for the trial court to find that G.O. is a "very intelligent man." The trial court's finding *1020 that G.O. is a "very intelligent man," and had "no problem" understanding his Miranda rights is flawed in two ways. 191 Ill.2d at 53, 245 Ill.Dec. at 278, 727 N.E.2d at 1012. First, it ignores the single most significant fact of this case: G.O. was just past his thirteenth birthday at the time of his arrest. He is not, as he was described by the trial court, a man. He is a boy. Second, the trial court's finding of "intelligence" suggests that G.O. was sufficiently sophisticated to withstand the coercion inherent in the circumstances of his interrogation. It is extremely significant that the sole evidence regarding G.O.'s intelligence-upon which the trial court based its finding, a finding relied upon by the majority-was the testimony of his mother, on her son's behalf, at the suppression hearing. She stated that he did "very well" in school and that he was a "smart kid." She was not asked these questions in the context of his ability to understand Miranda warnings, or whether he could resist intimidation by adults. It is reasonable to conclude that she told the court that her son did very well at school in an effort to convince the court that he was not a criminal, and not to convince the court that he was resistant to any coercive interrogation occurring at the police station. Again, the evidence of record is insufficient to sustain a finding that G.O. was a "very intelligent man" who had "no problem" understanding his Miranda rights, and understood and knowingly waived this constitutional rights.
An intelligent relinquishment of the right against self-incrimination requires an individual to understand the entitlement to counsel and the right to remain silent promised by the Constitution. A knowing waiver of these constitutional rights also requires an understanding and comprehension of the serious consequences that can flow from confession to a crime. The burden is on the State to show that G.O., irrespective of his monosyllabic answers to his interrogators, comprehended the consequences of a waiver of Miranda rights. People v. Gilliam, 172 Ill.2d 484, 501, 218 Ill.Dec. 884, 670 N.E.2d 606 (1996). The State failed to satisfy this burden. The record does not support a contrary conclusion. See Gallegos v. Colorado, 370 U.S. 49, 54, 82 S.Ct. 1209, 1212-13, 8 L.Ed.2d 325, 328-29 (1962). In Gallegos, the Court recognized the limited ability of a minor to comprehend constitutional concepts:
"[A] 14 year old boy, no matter how sophisticated, is unlikely to have any conception of what will confront him when he is made accessible only to police. That is to say, we deal with a person who is not equal to the police in knowledge and understanding of the consequences of the questions and answers being recorded and who is unable to know how to protect his own interests or how to get the benefits of his constitutional rights." Gallegos, 370 U.S. at 54, 82 S.Ct. at 1212, 8 L.Ed.2d at 328.
In addition, I am not persuaded that the mere presence of two youth officers during the course of the interrogation indicates that G.O.'s confession was voluntary. The record indicates these officers were silent as the detective and the assistant State's Attorney questioned G.O. The youth officers, unknown to G.O., were only a mute presence in the interrogation room. The record does no reflect any genuine help given by the youth officers to G.O. See 304 Ill.App.3d at 733, 237 Ill.Dec. 717, 710 N.E.2d 140. Also, I question whether the presence of a youth officer shields a youth's rights from an overbearing interrogation. "Youth officers" are police officers, employed and summoned by law enforcement authorities. 705 ILCS 405/5-101, 5-405 (West. 1998); Pub. Act 90-590, art. 2001, § 2001-10, eff. January 1, 1999. Thus, while they are intended to serve the laudable purpose of aiding youths in trouble, the fact remains that, as an adjunct of law enforcement, their interests are inevitably conflicted. A youth officer who essentially serves two masters-the youth and the State-may not adequately protect a juvenile's rights from an interrogator who is also working on behalf of the government. *1021 The dual nature of the youth officer's employment raises the possibility that the officer may not represent the youth's rights with the vigor of a family member, or of an attorney who owes a fiduciary duty to the juvenile.
Moreover, the majority overlooks the questionable accuracy of the alleged statements obtained from G.O. by the assistant State's Attorney and the detective that interviewed G.O. The prosecutor testified at the suppression hearing that he made notes of his interrogation of G.O. "after talking-or while talking to" G.O. Similarly, the detective testified that his notes of G.O.'s "confession" were part summary and part verbatim memorialization of the interrogation, and were not made until after the interrogation ended. In neither instance was a court reporter present to make a contemporaneous record of the conversations between G.O. and the persons that questioned him. In neither instance was G.O. shown notes or a written statement to review. The majority relies, therefore, on G.O.'s "confession" as remembered by the interrogators that heard the statements, and not as G.O. actually stated the confession.
As the majority notes, whether the police impeded a parent or guardian's access to the youth is one of the material factors to be considered in the "totality" test. 191 Ill.2d at 56-57, 245 Ill.Dec. at 278-79, 727 N.E.2d at 1012-13. The evidence in this case does not support the majority's conclusion that "the police never frustrated any attempt by respondent's mother to confer with him." 191 Ill.2d at 56, 245 Ill.Dec. at 279, 727 N.E.2d at 1013. The evidence suggests an effort by police to complete their questioning of G.O. before his mother could get to the station. Even if it is conceded that the mother's statements as to whether she would come to the police station were ambiguous, the difficulty of the mother obtaining transportation at 12:15 a.m. cannot be doubted. She told the detective that she would have to rely on public transportation. Nothing in the record suggests that any officer, though not required to do so, offered to pick up and drive G.O.'s mother to the police station before interrogation began. To the contrary, and in spite of the mother's declared difficulty in obtaining transportation, interrogation of G.O. began approximately 15 minutes after the police called his mother. It was inaccurate for the interrogating detective to inform one of the youth officers that G.O.'s mother refused to come to the station. At best, the conduct of the police in this regard should have a neutral effect on our evaluation; at worst, this fact should weigh in favor of suppressing the confession.
Worse than the evidentiary lapses in the majority holding, however, is the assumption that, at age 13, G.O. was sufficiently intelligent to knowingly waive his Miranda rights. Although the majority rejects the per se rule urged by the amicus curiae the Northwestern University Legal Clinic concerning admission of juvenile confessions, I urge my colleagues to revisit the issue. Indeed, I favor and recommend that the court adopt a per se rule whereby no confession given by a juvenile under the age of 15 would be admitted into evidence unless the youth is permitted, before or during interrogation, to consult with a lawyer or other adult, preferably a family member, who is personally interested in the child's well-being. See Comment, Testing the Validity of Confessions and Waivers of the Self-Incrimination Privilege in the Juvenile Courts, 47 U. Kan. L.Rev. 1035, 1055 (1999) (hereinafter, Testing the Validity). The adult acting on behalf of the juvenile must also be informed of the child's constitutional rights. Testing the Validity, 47 U. Kan. L.Rev. at 1055.[10]
Sound justifications favor adoption of a per se rule. Beneath a certain age, no *1022 person can reliably be believed to make a knowing waiver of the right against self-incrimination. Two well-known studies show that only a few persons under age 18 are able to grasp the meaning of the Miranda warnings. Testing the Validity, 47 U. Kan. L.Rev. at 1050 n. 129, citing B. Ferguson & A. Douglas, A Study of Juvenile Waiver, 7 San Diego L.Rev. 39 (1970); T. Grisso, Juveniles' Capacities to Waive Miranda Rights: An Empirical Analysis, 68 Cal. L.Rev. 1134 (1980); E. Maykut, Who Is Advising Our Children: Custodial Interrogation of Juveniles in Florida, 21 Fla. St. U.L.Rev. 1345, 1368-1371 (1994) (citing same studies) (hereinafter, Who Is Advising Our Children). At age 14 and younger, the ability to understand the warnings falls dramatically. Who Is Advising Our Children, 21 Fla. St. U.L.Rev. at 1369-70. To presume that all adolescents are capable of understanding the right against self-incrimination and are able to make an informed waiver of that right ignores the basic maturation process common to all persons. We assume that adolescents lack the judgment and experience necessary to own a credit card (815 ILCS 140/7.2 (West 1998)), get a tattoo (720 ILCS 5/12-10 (West 1998)), consume alcohol (235 ILCS 5/6-16 (West 1998)), or drive an automobile (625 ILCS 5/6-103 (West 1998)). Yet the majority insists that youths of the same age can synthesize subtle constitutional concepts, and comprehend the life-altering consequences that will follow a waiver of those rights. Our adherence to this artificial distinction is nonsensical and should be abandoned.[11]
Adoption of a per se rule will lend greater predictability to the admission of juvenile confessions into evidence. The totality of the circumstances test is facially appealing, because it incorporates the basic truth that all criminal defendants and all custodial interrogations are unique. Nonetheless, the very flexibility of the "totality" test makes it difficult to predict, during the course of an interrogation, which confessions will be deemed knowingly and voluntarily made and thus admissible into evidence and which confessions will be viewed as constitutionally infirm. For this reason, concrete guidelines governing confessions obtained from minors 14 years or younger will be of assistance to the police and courts in their determination of whether a statement will be admissible at trial. Who Is Advising Our Children, 21 Fla. St. U.L.Rev. at 1355.
For the foregoing reasons, I dissent from the majority holding that no error occurred in the admission of G.O.'s confession. G.O.'s finding of delinquency should be reversed and G.O. should be given a new trial at which his confession would not be admitted. I also urge the court to adopt the per se guideline.
NOTES
[1] A habitual juvenile offender is a juvenile who (1) has twice been adjudged delinquent of acts which, had the juvenile been prosecuted as an adult, would have been felonies; and (2) is then adjudged delinquent of one of several enumerated offenses. See 705 ILCS 405/5-35(a) (West 1996). A violent juvenile offender is a juvenile who is adjudicated delinquent a second time for an offense which, had the juvenile been prosecuted as an adult, would have been a Class 2 felony or greater, and which involved the use or threat of physical force or violence against an individual or which includes as an element the possession or use of a firearm. 705 ILCS 405/5-36(a) (West 1996). Both statutes also contain certain time requirements that must be satisfied. See 705 ILCS 405/5-35(a), 5-36(a) (West 1996).
[2] While its petition for leave to appeal was pending, the State sought leave to cite additional authority. This court ordered the motion taken with the case. Because we granted the State's petition for leave to appeal and because the State cited the authority in its brief, that motion has been rendered moot.
[3] Contrary to Justice Heiple's assertions (see 191 Ill.2d at 62, 245 Ill.Dec. at 282, 727 N.E.2d at 1016), we do not hold that a due process argument is foreclosed by Fucini. Instead, we hold that, in the absence of the mandatory sentencing provision, respondent does not ask this court to reconsider Fucini. The argument considered by Justice Heiple is not before this court and we express no opinion upon its merits.
[4] We note that, when this case was being briefed, two districts of the appellate court had held that Public Act 88-680 violated the single subject clause. See People v. Williams, 302 Ill.App.3d 975, 236 Ill.Dec. 642, 707 N.E.2d 980 (1999); People v. Dainty, 299 Ill. App.3d 235, 233 Ill.Dec. 475, 701 N.E.2d 118 (1998). Further, the question was pending before this court in Cervantes.
[5] Rival gang members.
[6] We note that respondent asserts that he did not understand his Miranda rights. The trial court specifically found that respondent understood those rights, and, after reviewing the record, we are unable to conclude that this finding is against the manifest weight of the evidence.
[7] Since Public Act 88-680 was declared void ab initio in People v. Cervantes, 189 Ill.2d 80, 243 Ill.Dec. 233, 723 N.E.2d 265 (1999), G.O. must be sentenced under section 5-33 of the Juvenile Court Act (705 ILCS 405/5-33 (West 1992)). Section 5-33 provided:

"(1) When any delinquent has been adjudged a ward of the court under this Act, the court may commit him to the Department of Corrections, Juvenile Division, if it finds that (a) his parents, guardian or legal custodian are unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor, or are unwilling to do so, and the best interests of the minor and the public will not be served by placement under Section 5-29; or (b) it is necessary to ensure the protection of the public from the consequences of criminal activity of the delinquent.
(2) The commitment of a delinquent to the Department of Corrections shall be for an indeterminate term which shall automatically terminate upon the delinquent attaining the age of 21 years unless the delinquent is sooner discharged from parole or custodianship is otherwise terminated in accordance with this Act or as otherwise provided for by law." 705 ILCS 405/5-33 (West 1992).
Section 5-33 was subsequently repealed by Public Act 90-590, effective January 1, 1999. Whether G.O. is subject to the mandatory minimum sentence for first degree murder (705 ILCS 405/5-33(1.5) (West 1996)) reenacted by Public Act 90-590 is not properly before this court. See 191 Ill.2d at 43-44, 245 Ill.Dec. at 274-75, 727 N.E.2d at 1007-08.
[8] Notably, even the adult criminal justice system espouses rehabilitation as one of its primary goals. Article I, section 11, of the Illinois Constitution of 1970 states that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." (Emphasis added.) Ill. Const. 1970, art. I, § 11.
[9] The Illinois Constitution of 1970 retained the jury trial provision in article II, section 5, of the Constitution of 1870. See Ill. Const. 1970, art. I, § 13. Section 13, however, now applies solely to the right to a jury trial in civil cases and merely supplements the right to the jury trial in criminal cases contained in article I, section 8. ILCS Ann., 1970 Const., art. I, § 8, Constitutional Commentary, at 3 (Smith-Hurd 1997).
[10] A bill codifying a per se rule is currently pending before the Illinois legislature. 91st Ill. Gen. Assem., House Bill 3674, 2000 Sess. Among other things, the proposed statute would bar the admission into evidence of any statement obtained during a custodial interrogation of a minor under 15 years of age, in the absence of a parent or legal guardian, and without first allowing the minor to consult with counsel. 91st Ill. Gen. Assem., House Bill 3674, 2000 Sess.
[11] Other states, including Indiana, Iowa and Wisconsin, have adopted per se rules identical or similar to the rule I urge the court to consider here. See Lewis v. State, 259 Ind. 431, 288 N.E.2d 138 (1972); In re Dino, 359 So.2d 586 (La.1978); In re E.T.C., 141 Vt. 375, 449 A.2d 937 (1982); Commonwealth v. A Juvenile, 389 Mass. 128, 449 N.E.2d 654 (1983); Conn. Gen.Stat. § 46b-137(a) (1992); Okla. Stat. tit. 10, § 1109(a) (Supp.1994); Wis. Stat. § 48.23 (1987 & Supp.1993); Iowa Code § 232.11 (1993).