Filed 11/18/08          NO. 4-06-1077

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| In re: JONATHAN C.B., a Minor, | ) | Appeal from |
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Circuit Court of |
|      Petitioner-Appellee, | ) | Champaign County |
|      v. | ) | No. 06JD127 |
| JONATHAN C.B., | ) | |
|      Respondent-Appellant. | ) | Honorable |
| | ) | Heidi Ladd, |
| | ) | Judge Presiding. |

_____

JUSTICE McCULLOUGH delivered the opinion of the court:

The trial court adjudicated respondent, Jonathan C.B., a delinquent minor, finding him guilty of criminal sexual assault (720 ILCS 5/12-13(a)(1) (West 2004)) and attempt (robbery) (720 ILCS 5/8-4(a), 18-1 (West 2004)), and ordered him to be committed to the Illinois Department of Juvenile Justice for an indeterminate term to automatically terminate upon the first of the passage of 15 years or respondent attaining the age of 21. Respondent appeals, arguing (1) the State failed to prove him guilty of criminal sexual assault beyond a reasonable doubt; (2) his due-process rights were violated when he was shackled during his bench trial; and (3) section 5-101(3) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/5-101(3) (West 2004)), as applied to juveniles charged with sex offenses, is unconstitutional because it denies juveniles the right to a jury trial. We affirm.

On August 24, 2006, the State filed a supplemental petition for adjudication of wardship, alleging respondent was a

delinquent minor and charging him with criminal sexual assault (720 ILCS 5/12-13(a)(1) (West 2004)) and attempt (robbery) (720 ILCS 5/8-4(a), 18-1 (West 2004)). On August 30, 2006, respondent's bench trial began. At respondent's trial, the State presented evidence that during the late evening on July 10, 2006, and the early morning on July 11, 2006, respondent, who was 16 years old, and another minor, G.W., sexually assaulted and attempted to rob 45-year-old C.H. Respondent's theory of the case was that he and G.W. paid C.H. $40 for sex and then attempted to retrieve their money.

C.H. testified that at approximately 11:30 p.m. on July 10, 2006, she left her home to make a phone call at her friend Donnie Stewart's house. As she walked to Stewart's house, she was approached by a tall boy and a shorter, younger boy. C.H. identified respondent as the taller boy. She stated the shorter boy commented to her "I have three for one." She told him he should be home in bed and respondent told C.H. that the shorter boy was his brother and she was not to speak to him that way. C.H. testified the boys made her uncomfortable and she continued on her way.

C.H. arrived at Stewart's house and used his phone. She remained there approximately 10 minutes and then left to return home. As she was walking home, she heard footsteps behind her and saw respondent and a second boy. The second boy was not the same boy from the earlier encounter and C.H. described him as being short and stout. C.H. testified the boys called to her and

- 2 -

respondent asked her if she wanted a drink. She stated he raised the garage door on a nearby duplex using a button and asked her to come toward the garage. C.H. declined and respondent let the garage door down. He then suggested they go have a drink at the back of the house. C.H. testified the shorter boy grabbed her arm and pulled her behind the house. She was pushed to her knees and felt respondent, who was behind her, put his penis in her vagina. The shorter boy placed his penis in C.H.'s mouth. C.H. stated she fought back to no avail and was screaming. During the attack, her bra and shirt were torn.

C.H. testified she saw people across the street but no one helped her. A boy walked by and asked what was happening. C.H. stated the shorter boy became startled and let go of her. She was able to get away but slipped and fell. C.H. then saw her friend Keisha driving by and asked her for help. Keisha drove an orange or gold vehicle that was "maybe like a truck." According to C.H., respondent told Keisha not to let C.H. in Keisha's vehicle because the police were coming and Keisha did not let her in. Respondent presented testimony from Takesha Williams, who stated she drove an orange Pontiac Aztec, which she described as a "funny-made truck." She was acquainted with C.H. but denied that C.H. approached her and asked for a ride on the date of the alleged offenses. Instead, Williams asserted she was at her home with her children.

C.H. testified that, after being denied entry into Keisha's vehicle, she continued on and was able to get to a tree

near the back of her house. At that point, respondent hit her on the back of her head and knocked her down. C.H. stated she always carried a pocketknife with her when she was out after dark and respondent yelled at her to "drop the knife." Respondent also put his foot on her left arm and held it down. The other boy started stomping on C.H.'s head.

C.H. testified she saw a light and heard a male voice say "let her go." The male voice belonged to a police officer. C.H. testified an ambulance also arrived at the scene. She received medical care for injuries to her arm. C.H. also reported that her stomach hurt. She refused to go to the hospital. Further, C.H. acknowledged that she did not tell police she had been sexually assaulted but stated she did report the sexual assault to paramedics.

Sarah Ramey, a paramedic employed by Arrow Carle Ambulance, testified that, in the early morning hours of July 11, 2006, she and her partner were dispatched to C.H.'s location. Ramey observed C.H., whom she described as hysterical, crying, and having trouble breathing. C.H. appeared to be intimidated by men on the scene and immediately reached for Ramey. C.H. stated she wanted to go home but agreed to go into the ambulance so Ramey could check her injuries. As Ramey helped C.H. to the ambulance, C.H. whispered to Ramey that C.H. "was raped." Ramey testified she observed abrasions on both of C.H.'s elbows and a shoe print on her left arm. C.H. also had some tenderness in her abdomen. Ramey stated she pleaded with C.H. to go to the hospi-

tal but C.H. refused.

Destiny Nesbitt testified she was respondent's cousin and was with him on the evening of July 10, 2006. At about 10:45 p.m., respondent asked for $40 because there were some girls in the neighborhood and he needed money. Nesbitt gave respondent the money and then went to sleep at approximately 11 p.m. Shortly after 1 a.m., Nesbitt's boyfriend spoke with respondent on the phone. During that conversation, respondent stated he had "hit a hype," which she understood to mean he hit a drug addict. Ultimately, Nesbitt learned the police were looking for respondent.

Nesbitt testified she lived in a duplex at 2701A Campbell Drive. A woman named Pooker lived on the other side of the duplex, 2701B, with her five children, including G.W.. The duplex had a garage, which Nesbitt also rented. She testified a key was required to get inside the garage and that it always stayed locked. On the night of the incident, Nesbitt learned respondent was inside Pooker's residence and attempted to persuade him to leave the residence and talk with police.

Sheriff's deputy Andrew Good testified that, on July 10, 2006, he was working as a patrol officer on the midnight shift. Around 1:15 a.m. he heard screaming and observed two males standing over a female. The males were screaming at the female and appeared to be striking her with their fists or hands. Good heard the males saying "Give me the money," and "Where is the bread." The female asked the males to stop hitting her and

stated she did not have any money.  Good also heard her tell the males to "put the knife down."

Good testified he observed the female stand up and run in his direction with the two males chasing her.  He drew his weapon, pointed his flashlight in their direction, identified himself as a sheriff's deputy, and ordered them to stop.  The two males turned and ran in the opposite direction.  Good observed that the female was wearing a tank top that was torn, exposing her bra strap.  Her bra was also torn and her pants were soiled in the crotch area.  Good described her as hysterical and stated it was hard to get information from her.  At first, the female stated she had been raped and the two males had a gun.  Good saw that her elbows and arms were scratched and her elbows were bleeding.

Ultimately, the female was able to tell police where her attackers came from.  She described a duplex with a large tree in the front yard.  Police went to a residence at 2701 Campbell Drive but were unable to immediately make entry.  They tried contacting people inside the residence and eventually someone opened the door and they were able to take custody of two suspects, G.W. and respondent.  A show-up identification was conducted.  Good heard respondent state that he and G.W. "just went up to help her" but they "saw the police and *** ran."  Eventually, G.W. and respondent were arrested and transported to a detention center.  Good described G.W. as being "five five" and weighing 160 pounds and respondent as being "five two" and

- 6 -

weighing 115 pounds.

Sheriff's deputy Norman Meeker testified that on July 10, 2006, he was working the 11 p.m. to 7 a.m. shift and was dispatched to the area of the incident in question to assist with a fight. Later, the nature of the dispatch changed and he was informed that it was an armed robbery. He was provided with descriptions of the suspects and the direction they were traveling. He began walking on Campbell Drive alongside houses. At 2701A Campbell, he heard someone talking on the phone, saying "they better have their [$40]."

Meeker continued to watch the duplex and observed the front door on one side open and close approximately five times. Eventually, he made contact with Nesbitt from 2701A. She stated she was getting her cousin, whom she identified as respondent. Nesbitt stated she was supposed to be watching respondent and at about 1:15 a.m. she received a phone call from him and he stated "he just hit a hype." She stated respondent was on the other side of the duplex. Nesbitt acknowledged she loaned respondent $40 earlier in the evening and he stated he no longer had it but would get it back for her.

Meeker and other officers attempted to make contact with the people inside 2701B Campbell Drive by knocking and pounding on the door and announced that they were the sheriff's office. No one answered the knocking or pounding. Nesbitt was able to speak with somebody inside the residence by phone and Meeker asked her have them open the door. Eventually, around

- 7 -

2:15 a.m., the door was opened. Two suspects were found in the residence, G.W. and respondent. A show-up identification was conducted and Meeker heard respondent say something about how they "were just walking with [C.H.]." C.H. identified G.W. and respondent and they were arrested.

Meeker testified he later interviewed respondent. Respondent stated C.H. approached him earlier in the evening, wanting to sell a television. He replied that he did not have any money. They then discussed the possibility of C.H. doing something else for money. Respondent stated he had a friend and C.H. stated that was okay. Respondent called G.W. and obtained $40 from his cousin. Respondent stated both he and G.W. had sexual relations with C.H. behind 2701 Campbell Drive. Specifically, he stated he had oral sex with C.H. and G.W. had sexual intercourse with her. Respondent reported that, during the acts, C.H. fell over, cut herself, and her shirt and possibly her bra became torn. C.H. then became upset and asked respondent and G.W. to walk her home so her husband would not be mad. Respondent stated that, as they were walking, C.H. "freaked out" and began yelling and screaming. At one point, she also pulled out a box cutter. The police then arrived on the scene, and he and G.W. ran away.

Meeker testified respondent later changed his story. First, he asserted he never actually engaged in any sexual activity with C.H. because she fell over. Second, respondent informed Meeker that he and G.W. began following C.H. as she left

because they wanted to get their $40 back. He stated G.W. hit C.H. and knocked her down in an attempt to get the money. At that time, the police arrived. Respondent asserted he never hit C.H. According to Meeker, respondent also reported that, while he and G.W. were inside the residence at 2701B Campbell, they discussed what they were going to tell police about what happened.

Curtis Apperson testified he was an investigator for the sheriff's department and he and sheriff's deputy William Davis interviewed C.H. Initially, the offense they were investigating was an armed robbery. However, during the interview, C.H. reported she had been raped and the nature of the investigation changed. Apperson stated C.H. was emotional when she disclosed the sexual assault. He and Davis collected the clothing she had been wearing during the offenses and took her to the hospital to obtain a rape kit. Apperson asked C.H. why she did not report the sexual assault earlier to police. She explained that she had been the victim of a rape before but police did not believe her. She felt her claims would not be investigated. C.H. did report to Apperson and Davis that she told a female paramedic or firefighter that she was raped.

Apperson and Davis transported C.H. to the hospital, where they continued to interview her. Apperson stated C.H.'s emotions were up and down. At times, she was calm, but at other times she became very emotional and was crying and lowering her head.

Apperson testified C.H. reported $50 was taken from her during the incident. He also stated she reported that, prior to being attacked, she had been to two places, Antoine's house and Donnie's house. However, Apperson stated it was difficult to talk to C.H. because of her emotions so he was "not exactly clear" where C.H. stated she had been prior to when the offenses allegedly occurred. Davis testified C.H. reported that she was at Antoine's house before the incident in question and that she had a birthday drink. She did not mention anyone named Donnie Stewart to Davis. Also, he stated C.H. told him she was initially approached by three individuals rather than two.

Mary Sexton testified she was a registered nurse and performed a sexual assault kit on C.H. C.H. reported to Sexton that she had been walking home from a friend's house and the friend had not been home. She was raped by two young males and stated she had seen a small gun.

Respondent testified he was 16 years old. On July 10 and 11, 2006, he was staying at the home of his cousin, Destiny Nesbitt. G.W. lived next door to Nesbitt. Between midnight and 12:30 a.m. on July 11, 2006, C.H. approached respondent and G.W.'s little brother and asked them if they wanted to buy a television. Respondent replied that he did not. C.H. then asked respondent if he had any money or if he sold drugs. Respondent replied negatively to both questions. C.H. asked respondent if she could do anything for some money. Respondent understood that C.H. was referring to some type sexual activity. He testified he

called G.W. and C.H. offered to have sex with both of them for $20 each.

Respondent testified he borrowed $40 from Nesbitt. He gave G.W. $20 and G.W. and C.H. went behind the duplex and engaged in sexual intercourse. After 5 or 10 minutes, G.W. came out from behind the house and handed respondent a condom. Respondent then went behind the house and paid C.H. $20. C.H. performed oral sex on respondent and then the two engaged in vaginal sexual intercourse. Respondent testified that as he engaged in vaginal intercourse with C.H., he grabbed her shoulders and her bra strap tore. She also slipped and scraped her elbow. After slipping, C.H. got up and was crying. She asked respondent to walk her home because her boyfriend was going to beat her. Respondent agreed to walk her home and stated he did not get a chance to finish having sex with C.H.

Respondent testified that, as he and G.W. were walking C.H. home, they decided to get their money back from her. He stated, at that time, C.H. drew a knife and he told her to put it down. After C.H. put the knife away, G.W. shoved her and knocked her down. Respondent stepped on C.H.'s arm so that she would not go for her knife. G.W. searched C.H. but did not find any money. He asked her where her money was. Police appeared on the scene, flashed lights on them, and told them to stop. Respondent and G.W. ran to G.W.'s house and went inside. Police arrived at G.W.'s house 15 to 20 minutes later. Approximately five minutes later, G.W. opened the door and they were taken into custody.

- 11 -

After hearing all the evidence and the parties' arguments, the trial court found respondent guilty of both charged offenses and adjudicated him delinquent. On November 13, 2006, the court ordered him to be committed to the Illinois Department of Juvenile Justice for an indeterminate term to automatically terminate in 15 years or upon respondent attaining the age of 21, whichever came first.

This appeal followed.

On appeal, respondent first argues the State failed to prove him guilty of criminal sexual assault beyond a reasonable doubt. He maintains C.H. was not a credible witness and the trial court's judgment as to her credibility was not reasonable in light of the record.

"In reviewing the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) People v. Jordan, 218 Ill. 2d 255, 269, 843 N.E.2d 870, 879 (2006). A reviewing court's function is not to retry the defendant and it should not substitute its judgment for that of the trier of fact. People v. Sutherland, 223 Ill. 2d 187, 242, 860 N.E.2d 178, 217 (2006). "The weight to be given the witnesses' testimony, the credibility of the witnesses, resolution of inconsistencies and conflicts in the evidence, and reasonable inferences to be drawn from the testimony are the responsibility of the trier of fact." Suther-

land, 223 Ill. 2d at 242, 860 N.E.2d at 217.  A conviction must be reversed "where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of [the] defendant's guilt."  People v. Smith, 185 Ill. 2d 532, 542, 708 N.E.2d 365, 370 (1999).

A person commits criminal sexual assault if he or she performs an act of sexual penetration by the use of force or threat of force.  720 ILCS 5/12-13(a)(1) (West 2004).

Here, C.H. testified she was grabbed and taken behind a duplex where G.W. and respondent forced her to engage in sexual acts.  She stated she was screaming and fought back but was overpowered.  C.H. specifically testified respondent inserted his penis into her vagina.  The record reflects C.H. reported being "raped" immediately to paramedic Sarah Ramey and sheriff's deputy Andrew Good.  She was described by Ramey and police as being very emotional to the point of being hysterical.  Also, the trial court commented that C.H. became similarly emotional when providing testimony on the subject of the sexual assault.

Respondent points out C.H. provided inconsistent statements about where she went prior to the incident in question, how many boys she saw during an initial encounter, the opening and closing of the duplex's garage door, an encounter with her friend "Keisha" during the attack, and whether the boys had a gun.  Here, the trial court noted the case came down to issues of credibility and that inconsistencies were present in both C.H.'s testimony and respondent's testimony.  The court's

oral ruling in the case shows it thoroughly considered all of the evidence presented, including the inconsistencies in C.H.'s testimony. In the end, it found C.H. more credible than respondent. That finding is not so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of respondent's guilt.

Although C.H.'s testimony contained inconsistencies, they did not concern the essential facts of the sexual assault or attempted robbery. Moreover, respondent's own statements were inconsistent and evolved over time, reflecting negatively on his own credibility. He made several different statements, regarding the sexual acts he engaged in with C.H. After initially being taken into custody, police heard respondent state he was "just walking with [C.H.]" and that he was trying to help her. In his first statement to police, he stated he and C.H. engaged in oral sex but later changed his story and said they never engaged in any sexual acts. Finally, at trial, respondent testified he engaged in both oral and vaginal sex with C.H.

As the trial court pointed out, at trial, respondent asserted he met C.H. between midnight and 12:30 a.m. on July 11, 2006, and thereafter obtained $40 from his cousin, Destiny Nesbitt, to pay C.H. for sexual acts she agreed to perform. However, Nesbitt testified she gave respondent $40 at approximately 10:45 p.m. on July 10, 2006, at least 1 hour and 15 minutes before respondent asserted he encountered C.H.

Additionally, respondent's version of the acts sur-

rounding the attempted robbery was drastically different from the acts witnessed by sheriff's deputy Good. Respondent asserted G.W. shoved and knocked C.H. down and he only stepped on C.H.'s arm so that she could not go for her knife. C.H. screamed for help twice, and G.W. searched her and asked where the money was. At that point, police arrived on the scene and he and G.W. fled.

Good testified, however, that he heard screaming and observed two males standing over a female. The males were screaming at the female and appeared to be striking her with their fists or hands. The female asked the males to stop hitting her and stated she did not have any money. The female then stood up and ran in Good's direction with the two males chasing her. When Good made his presence known, the males ran in the opposite direction.

Respondent essentially asks this court to reweigh the evidence, which is not the function of a reviewing court. The record shows the trial court thoroughly considered the evidence and made a well-reasoned determination as to credibility. The evidence was sufficient to find respondent guilty of criminal sexual assault.

On appeal, respondent next argues the trial court violated his fourteenth amendment due-process guarantees by having him shackled without an individualized determination of necessity.

In People v. Boose, 66 Ill. 2d 261, 265, 362 N.E.2d 303, 305 (1977), the supreme court held that the shackling of a

defendant is disfavored because it (1) tends to prejudice the jury, (2) restricts the defendant's ability to assist his counsel during trial, and (3) offends the dignity of the judicial process. Nevertheless, a defendant may be shackled where a manifest need for restraints is shown. Boose, 66 Ill. 2d at 265-66, 362 N.E.2d at 305. Specifically, "[a] defendant may be shackled when there is reason to believe that he may try to escape or that he may pose a threat to the safety of people in the courtroom or if it is necessary to maintain order during the trial." Boose, 66 Ill. 2d at 266, 362 N.E.2d at 305.

Whether to restrain the defendant is within the trial court's discretion and its decision will not be reversed absent an abuse of that discretion. Boose, 66 Ill. 2d at 266-67, 362 N.E.2d at 305-06. The court must hold a hearing outside the presence of the jury, allowing the defendant's attorney the opportunity to argue why the defendant should not be shackled. Boose, 66 Ill. 2d at 266, 362 N.E.2d at 305. If it orders the defendant to remain shackled, the court must also state the reasons for its decision on the record. Boose, 66 Ill. 2d at 266, 362 N.E.2d at 305. Boose applies to both bench and jury trials. People v. Strickland, 363 Ill. App. 3d 598, 603, 843 N.E.2d 897, 901 (2006).

Here, only one small reference to respondent's shackling was made in the record. When respondent was called to testify on his own behalf the trial court stated as follows: "Okay. You may step up. You may take off the shackles. Sir, you

- 16 -

may go ahead and approach the bench.  Raise your right hand."
Respondent was then sworn in and proceeded to testify.  The
record contains no further mention of respondent's shackling and
he made no objection, either during his trial or in a posttrial
motion, to being shackled.

A defendant who fails to object to shackling at trial
or in a posttrial motion forfeits review of the issue on appeal.
People v. Barney, 363 Ill. App. 3d 590, 593, 844 N.E.2d 80, 83
(2006).  However, pursuant to the plain-error doctrine, a review-
ing court may consider otherwise forfeited issues if the evidence
was closely balanced or the error was of such magnitude that the
defendant was denied a substantial right and a fair trial.
Barney, 363 Ill. App. 3d at 593-94, 844 N.E.2d at 84.

"[P]lain error does not automatically occur when
shackles are used without a Boose hearing."  Barney, 363 Ill.
App. 3d at 596, 844 N.E.2d at 86.  Instead, "[w]ithout objecting
and preserving the issue for review, the defendant must show the
evidence was closely balanced or 'the error was so serious it
affected the fairness of his trial and challenged the judicial
process's integrity.'"  Barney, 363 Ill. App. 3d at 597-98, 844
N.E.2d at 87, quoting People v. Thompson, 359 Ill. App. 3d 947,
951, 835 N.E.2d 933, 936 (2005).

In Strickland, 363 Ill. App. 3d at 602, 843 N.E.2d at
901, this court considered whether the defendant was denied a
fair trial because the trial court ordered one of his hands to be
handcuffed to a table during his jury trial.  The defendant made

no objection to the court's order but argued the handcuffing resulted in plain error. Strickland, 363 Ill. App. 3d at 602, 843 N.E.2d at 901. We declined to reverse the defendant's conviction under the plain-error doctrine. Strickland, 363 Ill. App. 3d at 604, 843 N.E.2d at 903.

In part, we relied on People v. Hyche, 77 Ill. 2d 229, 240-41, 396 N.E.2d 6, 12 (1979), wherein the supreme court considered whether a defendant's conviction warranted reversal when he appeared before a jury in handcuffs but failed to make an objection. There, the court concluded the defendant had waived any error by failing to object and affirmed the trial court's judgment. Hyche, 77 Ill. 2d at 241, 396 N.E.2d at 12. In Strickland, 363 Ill. App. 3d at 604-05, 843 N.E.2d at 903, we noted the Hyche decision indicated it was "the State's compelling the defendant to wear restraints before the jury that create[d] the constitutional violation." We reasoned that "when a defendant fails to object to wearing restraints, the presence of compulsion is negated, and a constitutional violation has not been established." Strickland, 363 Ill. App. 3d at 605, 843 N.E.2d at 903.

Here, respondent made no objection to his shackling and the record does not indicate the trial court was even aware that he was shackled until he was called to testify. Pursuant to Strickland, reversal of respondent's convictions is not warranted by the plain-error doctrine.

Also, respondent failed to satisfy either prong of the

plain-error doctrine. First, the evidence in his case was not closely balanced. Respondent was charged with criminal sexual assault and attempted robbery. Although the testimony regarding the criminal sexual assault came down to a credibility determination between respondent and C.H., the evidence presented as a whole was not so close as to warrant application of the plain-error doctrine. During his testimony, respondent essentially admitted his part in the attempted robbery, acknowledging that he and G.W. agreed to take money from C.H. and that he restrained C.H. while G.W. searched her for money. He made similar admissions in his first statements to police. Further, as discussed, respondent's version of the events surrounding the criminal-sexual-assault charge contained many inconsistencies. The dissent insists the evidence was closely balanced but only considers the evidence in connection with the criminal sexual assault.

Respondent has also failed to show the error was so serious it affected the fairness of his trial and challenged the judicial process's integrity. As stated, the record does not show the trial court was even aware that respondent was shackled until he was called to testify. If the court had not suggested the shackles be taken off, the record would show nothing as to this issue. The court ordered the shackles removed and the record does not reflect respondent had to continue wearing them after he testified. The record does not show the court was prejudiced by respondent's shackles, they restricted his ability to assist his counsel, or the dignity of the judicial process was

- 19 -

offended. Additionally, more than sufficient evidence of respondent's guilty was presented at his trial.

Finally, we note respondent argues "shackling a minor so offends the basic notions of justice that trial courts should have a sua sponte duty to intervene." We find no authority for the position and respondent cites none. Also, again, the record fails to show the trial court was aware of the shackles prior to when respondent was called to testify and may not have been in a position to know it needed to intervene.

On appeal, respondent last argues section 5-101(3) of the Act (705 ILCS 405/5-101(3) (West 2004)), as applied to juveniles charged with sex offenses, is unconstitutional because it denies juveniles the right to a trial by jury. Specifically, he argues section 5-101(3) of the Act violates article I, section 8, of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, §8) and his state and federal constitutional rights to due process and equal protection.

"[A]ll statutes are presumed constitutional and *** the party challenging a statute's validity bears the burden of demonstrating a clear constitutional violation." In re Lakisha M., 227 Ill. 2d 259, 263, 882 N.E.2d 570, 573 (2008). If reasonably possible, a court must construe a statute so as to affirm its constitutionality. Lakisha M., 227 Ill. 2d at 263, 882 N.E.2d at 573. "[R]eview of a statute's constitutionality is de novo." Lakisha M., 227 Ill. 2d at 263, 882 N.E.2d at 573.

Section 5-101(3) of the Act (705 ILCS 405/5-101(3)

(West 2004)) provides that "[m]inors shall not have the right to a jury trial unless specifically provided by" the Act.

Respondent first argues section 5-101(3) is unconstitutional pursuant to article I, section 8, of the Illinois Constitution (Ill. Const. 1970, art. I, §8), which provides as follows:

"In criminal prosecutions, the accused shall have the right *** to have a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed."

Respondent maintains juveniles are entitled to a jury trial under the Illinois Constitution because juveniles charged with sex offenses are subject to criminal prosecution, resulting in a "conviction" upon a finding of guilt. He relies on the supreme court's statements in In re J.W., 204 Ill. 2d 50, 787 N.E.2d 747 (2003), equating the term "convicted" with "adjudicated." Additionally, respondent notes a shift in purpose and policy of the Act from rehabilitation to protecting the public and holding juvenile offenders accountable.

The supreme court has previously held that juveniles have no right to a jury trial under the Illinois Constitution. See In re Fucini, 44 Ill. 2d 305, 310, 255 N.E.2d 380, 382 (1970); In re Presley, 47 Ill. 2d 50, 55, 264 N.E.2d 177, 179 (1970). In In re G.O., 191 Ill. 2d 37, 43, 727 N.E.2d 1003, 1007 (2000), the court rejected arguments that the denial of a jury trial to a juvenile charged with first-degree murder violated

equal protection or due process. We note, although respondent relies heavily on Justice Heiple's dissenting opinion in that case, it is the G.O. majority's opinion which is precedential.

As asserted by the dissent, these cases do not address respondent's specific arguments. However, they have been cited by the parties and the dissent in G.O., relied upon by respondent, and we note them here by way of background.

To support his position in this case, respondent relies on In re A.G., 195 Ill. 2d 313, 746 N.E.2d 732 (2001). There, the supreme court held that "compliance with the [Supreme Court] Rule 604(d) certificate requirement [(210 Ill. 2d R. 604(d))] [was] required in juvenile proceedings." A.G., 195 Ill. 2d at 322, 746 N.E.2d at 737-38. In reaching that decision, the court made several observations about the Act. It noted the Act had "been significantly amended" in 1999 and thereafter contained "a purpose and policy section which represent[ed] a fundamental shift from the singular goal of rehabilitation to include the overriding concerns of protecting the public and holding juvenile offenders accountable for violations of the law." A.G., 195 Ill. 2d at 317, 746 N.E.2d at 735. Importantly, however, the court acknowledged proceedings under the Act were "still not criminal in nature and [were] to be administered in a spirit of humane concern for, and to promote the welfare of, the minor." A.G., 195 Ill. 2d at 317, 746 N.E.2d at 735.

Respondent next relies upon J.W., 204 Ill. 2d 50, 787 N.E. 2d 747, which he argues makes it "all but explicit that

- 22 -

juveniles are subject to full criminal prosecutions in an adversarial system."  That case dealt with the constitutionality of requiring a juvenile to register as a sex offender for his natural life.  J.W., 204 Ill. 2d at 62, 787 N.E.2d at 754.  However, J.W. dealt specifically and only with the Sex Offender Registration Act (Registration Act), which defined a juvenile sex offender as follows:

> "'"Juvenile sex offender" means any person who is adjudicated a juvenile delinquent as the result of the commission of or attempt to commit a violation set forth in item (B), (C), or (C-5) of this Section or a violation of any substantially similar federal, sister state, or foreign country law.  For purposes of this Section, "convicted" shall have the same meaning as "adjudicated."' 730 ILCS 150/2(A-5) (West 2000)."  J.W., 204 Ill. 2d at 63, 787 N.E.2d at 755.

The supreme court's holding in J.W. is limited to application of the Registration Act, which expressly stated, for purposes of the Registration Act, "convicted" and "adjudicated" had the same meaning.  As the State points out, J.W. does not stand for the broader proposition that all juveniles charged with sex offenses are subject to criminal prosecutions within the meaning of article I, section 8, of the Illinois Constitution or

- 23 -

that the term "convicted" always holds the same meaning as "adjudicated."

More recently, in <u>People v. Taylor</u>, 221 Ill. 2d 157, 182, 850 N.E.2d 134, 147 (2006), the supreme court determined juvenile adjudications should not be considered a conviction for purposes of the escape statute. In reaching that decision, the court reasserted that bench trials are "all that is constitution-ally required in juvenile delinquency proceedings" because a juvenile proceeding is not considered a criminal prosecution. <u>Taylor</u>, 221 Ill. 2d at 168, 850 N.E.2d at 140. Additionally, it stated as follows:

> "The policy that seeks to hold juveniles accountable for their actions and to protect the public does not negate the concept that rehabilitation remains a more important con-sideration in the juvenile justice system than in the criminal justice system and that there are still significant differences be-tween the two, indicating that 'the ideal of separate treatment of children is still worth pursuing.'" <u>Taylor</u>, 221 Ill. 2d at 170, 850 N.E.2d at 141, quoting <u>McKeiver v. Pennsyl-vania</u>, 403 U.S. 528, 546 n.6, 29 L. Ed. 2d 647, 661 n.6, 91 S. Ct. 1976, 1986 n.6 (1971).
>
> Although the 1999 amendments altered the policy and

purpose behind the Act, rehabilitation of juvenile offenders remains an important consideration, more important than in criminal proceedings. Additionally, the holding in J.W. was specific to the statute before it and does not broadly stand for the proposition that a juvenile adjudication is the same as a criminal conviction. Respondent has failed to meet his burden of establishing a constitutional violation of article I, section 8, of the Illinois Constitution.

Respondent next argues section 5-101(3) of the Act, as applied to juveniles charged with sex offenses, violates his due-process right to a trial under the state and federal constitutions, which he maintains "grant persons the right to a trial by jury when *** charged with a serious criminal offense." See U.S. Const., art. III, §2; Ill. Const. 1970, art. I, §13. More specifically, he contends his due-process rights entitle him to a jury trial because (1) the purpose of the Act is now to protect the public instead of to rehabilitate the juvenile and (2) a juvenile could be indefinitely and involuntarily committed as a sexually violent person based on nothing more than proof of his original bench adjudication of delinquency.

First, as stated, although a shift in purpose and policy of the Act did occur after the 1999 amendments, Taylor makes clear that rehabilitation remains an important purpose and policy behind the Act, more so than in the criminal justice system. We reject respondent's contention that "the purpose of the Act is now to protect the public instead of rehabilitate the

juvenile."  That may be one purpose of the Act but it is not the Act's sole purpose.

Second, respondent's argument that an adjudication of delinquency satisfies the requirements of the Sexually Violent Persons Commitment Act (Commitment Act) (725 ILCS 207/1 through 99 (West 2004)), exposing a juvenile to indefinite and involuntary commitment, is also without merit.  Three criteria must be alleged and established before a person may be committed as a sexually violent person under the Commitment Act: (1) the person must have been found delinquent for a sexually violent offense (725 ILCS 207/15(b)(1)(B) (West 2004)), (2) the person must suffer from a mental disorder (725 ILCS 207/15(b)(4) (West 2004)), and (3) the person must be dangerous to others because his or her mental disorder creates a substantial probability that he or she will engage in acts of sexual violence (725 ILCS 207/15(b)(5) (West 2004)).

Respondent argues an adjudication of delinquency for a sexually violent offense is sufficient to establish all three elements under the Commitment Act.  To support his position, respondent cites portions of the dissenting opinion in In re Detention of Samuelson, 189 Ill. 2d 548, 568, 727 N.E.2d 228, 239 (2000) (Heiple J., dissenting) ("[T]he State's expert in this case was able to diagnose [the] defendant as having a 'mental disorder' *** solely by virtue of [the] defendant's having committed the acts which led to his criminal conviction and punishment" (emphasis omitted)).  We find the dissenting opinion

in Samuelson specific to the facts of that particular case. Also, it is not precedential. It remains that the Commitment Act requires three separate criteria to be established.

Additionally, respondent has failed to allege facts showing he could be subject to commitment as a sexually violent person. His delinquency adjudication for a qualifying offense is insufficient, alone, to satisfy the Commitment Act's requirements.

Finally, on appeal, respondent argues juveniles charged with sex offenses have an equal-protection right, under the state and federal constitutions, to a trial by jury. See U.S. Const. amend. XIV; Ill. Const. 1970, art. I, §2. "Equal protection guarantees that similarly situated individuals will be treated in a similar fashion, unless the government can demonstrate an appropriate reason to treat them differently." People v. Whitfield, 228 Ill. 2d 502, 512, 888 N.E.2d 1166, 1172 (2007). "In cases where fundamental rights are not at issue, we employ so-called rational basis scrutiny and consider whether the challenged classification bears a rational relationship to a legitimate governmental purpose." Whitfield, 228 Ill. 2d at 512, 888 N.E.2d at 1172.

Respondent argues juveniles charged with sex offenses are similarly situated to other juvenile offenders who are subject to extended juvenile jurisdiction (EJJ) and are accorded the right to a jury trial (705 ILCS 405/5-810(3) (West 2004)), as well as adult offenders charged with sex offenses. He maintains

no rational basis exists for treating those similarly situated groups differently.  We agree with the State and find respondent has failed to show he is similarly situated to juveniles subject to EJJ proceedings or adult offenders charged with sex offenses.

Again, respondent supports his contention with the argument that the purpose and policy of the Act, as it relates to juvenile sex offenders, is the protection of society rather than rehabilitation of the juvenile offender.  As already discussed, we reject this contention and find, while the policies and purposes of the Act changed after the 1999 amendments to include the protection of society and holding juvenile offenders account- able for their crimes, rehabilitation remains an important purpose and policy of the Act.

Next, respondent argues he is similarly situated to juveniles subject to EJJ and adult sex offenders because a juvenile sex offender faces the possibility of future commitment as a sexually violent person pursuant to the Commitment Act. Juveniles subject to EJJ face sentencing as juveniles and, like adult criminal offenders, an adult criminal sentence that is "stayed on the condition that the offender not violate the provisions of the juvenile sentence."  705 ILCS 405/5-810(4) (West 2004).

Here, respondent does not face the possibility of an adult criminal sentence and is therefore not similarly situated to juveniles subject to EJJ proceedings or adult offenders. Further, he has failed to show that he is or could be subject to

commitment as a sexually violent person under the Commitment Act. As the State points out, "[c]ommitment under the [Commitment Act] can result only after a successful separate action by the State, requiring proof of additional elements not common to all sex offenders, whether juvenile or adult."  Respondent failed to meet his burden of proving section 5-101(3) of the Act violated his equal-protection rights.

Here, the record shows the State presented sufficient evidence to prove respondent committed the offense of criminal sexual assault beyond a reasonable doubt and that his due-process rights were not violated when he was shackled during his bench trial.  Additionally, respondent has failed to establish section 5-101(3) of the Act, as applied to juveniles charged with sex offenses, is unconstitutional.

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

MYERSCOUGH, J., concurs.

APPLETON, P.J., dissents.

PRESIDING JUSTICE APPLETON, dissenting:

I respectfully dissent from the majority's decision.  I would reverse the trial court's judgment, and remand this case for a new trial, for two reasons.  First, the evidence was closely balanced, and failing to hold a Boose hearing was plain error.  Second, section 5-101(3) of the Act (705 ILCS 405/5-101(3) (West 2004)), as applied to juveniles charged with sex offenses, is unconstitutional because it denies juveniles the right to a jury trial.

A. The Unnecessary Shackling of Respondent

The supreme court has said that requiring a defendant to wear shackles during trial without a strong necessity for the shackling jeopardizes the value and protection of the presumption of innocence.  In re Staley, 67 Ill. 2d 33, 37, 364 N.E.2d 72, 73 (1977).  If the only reason a defendant is in shackles is the alleged offense for which he is on trial, he justifiably would feel skeptical if the court happened to mention to him that he was presumed innocent until proved guilty.  Any sensible person in his position would regard such a statement as pro forma hypocrisy.

"Every accused person *** enters upon his trial clothed with the presumption of innocence." Yee Hem v. United States, 268 U.S. 178, 184, 69 L. Ed. 904, 906, 45 S. Ct. 470, 472 (1925).  But in the circuit court of Champaign County, defendants wear chains as a seeming matter of course.  See Barney, 363 Ill. App. 3d at 592, 844 N.E.2d at 83 (appeal from Champaign County, in

- 30 -

which we discussed the requirements of <u>Boose</u>). Like the defense counsel in <u>Barney</u>, defense counsel in this case never objected. We held in <u>Barney</u>, 363 Ill. App. 3d at 596, 844 N.E.2d at 86, that "plain error does not automatically occur when shackles are used without a <u>Boose</u> hearing." It does not follow that unnecessary shackling can never be plain error.

The supreme court has held that a defendant can prove plain error in two alternative ways:

> "First, where the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence, a reviewing court may consider a forfeited error in order to preclude an argument that an innocent person was wrongly convicted. [Citation.] Second, where the error is so serious that the defendant was denied a substantial right, and thus a fair trial, a reviewing court may consider a forfeited error in order to preserve the integrity of the judicial process. [Citations.] This so-called disjunctive test does not offer two divergent interpretations of plain error, but instead two different ways to ensure the same thing--namely, a fair trial." <u>People v. Herron</u>, 215 Ill. 2d 167, 178-79, 830 N.E.2d 467, 475 (2005).

Before deciding whether plain error occurred, it is logical to consider whether any error at all occurred. People v. Hudson, 228 Ill. 2d 181, 191, 886 N.E.2d 964, 971 (2008). (I note that at oral argument, counsel for the State asserted that the record did not disclose that the trial court was aware respondent was shackled during the proceedings prior to his testimony. Whether or not skirting at the counsel table existed, given that the trial court directed that the shackles be removed from respondent during his testimony from the witness stand would seem to imply that the trial court was in a position to observe respondent's shackling prior to that time.) The majority cites decisions holding that unless a defendant objected to being shackled, the shackling violated no constitutional right because the State never compelled the defendant to be shackled. Hyche, 77 Ill. 2d at 241, 396 N.E.2d at 12; Strickland, 363 Ill. App. 3d at 605, 843 N.E.2d at 903. It is beyond belief that just because defense counsel fails to object, the defendant is wearing shackles by his own free choice. The more likely explanation is that defense counsel assumed an objection would be futile because routine shackling is the modus operandi. In any event, the supreme court apparently no longer subscribes to the rather facile no-objection, no-compulsion rationale of Hyche. In People v. Allen, 222 Ill. 2d 340, 353-54, 856 N.E.2d 349, 357 (2006), the supreme court held that even though the defendant never objected to wearing an electric stun belt during trial, "the failure to conduct a Boose hearing *** [was] an error," a "due[-]

- 32 -

process violation" (Allen, 222 Ill. 2d at 353, 856 N.E.2d at 356). Therefore, I infer that the failure to object to shackles does not negate the error of failing to hold a Boose hearing.

The supreme court concluded in Allen, 222 Ill. 2d at 353, 856 N.E.2d at 356, that although the defendant had "prove[d] a due[-]process violation which amounted to error by showing that he was required to wear an electronic stun belt at trial without the court having first determined that it was necessary," the defendant had failed to establish "'that the error was so serious that it affected the fairness of [his] trial and challenged the integrity of the judicial process'" (i.e., the second of the two alternative ways of establishing plain error, as described by Herron). Allen, 222 Ill. 2d at 353, 856 N.E.2d at 356. The supreme court added: "Here, [the] defendant cannot, and does not, claim that the evidence presented was closely balanced" (referring to the other way of establishing plain error). Allen, 222 Ill. 2d at 353, 856 N.E.2d at 357.

Likewise, in the appeal before us, the majority declares that "the evidence in [respondent's] case was not closely balanced." Slip op. at 19. The majority reasons as follows:

> "Respondent was charged with criminal sexual
> assault and attempted robbery. Although the
> testimony regarding the criminal sexual as-
> sault came down to a credibility determina-
> tion between respondent and C.H., the evi-
> dence presented as a whole was not so close

- 33 -

as to warrant application of the plain-error doctrine. During his testimony, respondent essentially admitted his part in the attempted robbery, acknowledging that he and G.W. agreed to take money from C.H. and that he restrained C.H. while G.W. searched her for money. He made similar admissions in his first statements to police. Further, as discussed, respondent's version of the events surrounding the criminal-sexual-assault charge contained many inconsistencies." Slip op. at 19.

Thus, even though "the criminal sexual assault came down to a credibility determination between respondent and C.H." (slip op. at 19), the majority did not find the evidence to be closely balanced, because (1) respondent admitted he attempted to rob C.H. and (2) his version of what happened "contained many inconsistencies" (slip op. at 19). As for the first reason, respondent's attempting to rob C.H. did not prove he sexually assaulted her. His attempting to rob her could prove, however, that she had sold sex to the two boys and they wanted their money back. A deputy sheriff, Andrew Good, testified that sometime around 1:15 a.m. on July 11, 2006, he was on patrol when he heard people screaming on Campbell Street. As he approached, he saw two males standing over a female. While striking her with their hands, the males were screaming at her, "Give me the money[!]" and "Where is

- 34 -

the bread[?]"  In his own testimony, respondent corroborated that is precisely what his companion, G.W., said to C.H.:  "Where is the money?  Where is the bread?"  Note the repetition of the definite article in both Good's and respondent's testimony:  the money and the bread.  In their confrontation with C.H., the two boys were referring not to money in general but to a specific res--namely, the cash they testified they had paid C.H. for her sexual services, or so a trier of fact could reasonably infer.

The second reason the majority gives for finding the evidence not to be closely balanced is just as unconvincing as the first.  The majority says that respondent's testimony "contained many inconsistencies."  Slip op. at 19.  That is true, but in the majority's assessment of the evidence, the inconsistencies in C.H.'s testimony and statements apparently do not count.  I will not go so far as to say that the evidence is insufficient, as a matter of law, to sustain the conviction of criminal sexual assault, but C.H.'s credibility could fairly be questioned.  She contradicted herself repeatedly, and her testimony was irreconcilable with certain physical realities of the crime scene.  To fasten on the inconsistencies in respondent's testimony and ignore the problems in C.H.'s testimony does not constitute an imbalance in the testimony, but only a determination that under our standard of review, we cannot second-guess the credibility determinations of the trier of fact.  We cannot decide whether the evidence was closely balanced without objectively weighing the evidence on both sides.

Given respondent's testimony that C.H. approached him on the street around midnight on July 11, 2006, and offered to have sex with him for payment, one naturally would be interested in knowing where C.H. was going at that hour and where she had been. This is not to suggest that anyone strolling the streets at midnight should be suspected of prostitution, but respondent alleged that C.H. approached him and after offering to sell him a television, offered to "do anything" for money; therefore, one might have expected the State to counter his allegation with credible and definite corroborating evidence that C.H. was, to the contrary, out on some legitimate errand. Such evidence was not forthcoming, and C.H.'s statements were inconsistent on this question. C.H. told a police officer, Curt Apperson, that she was on her way home from visiting a friend named Antoine when the two boys sexually assaulted her. Later, at the hospital, she told Apperson a different story: that she had been to the house of a friend named Donnie. She told another police officer, William Davis, that she had gone to Antoine's house, and she never mentioned Donnie to him. The State called neither Antoine nor Donnie. Apparently, Donnie's last name is Stewart. The record does not seem to reveal Antoine's last name.

A registered nurse, Mary Sexton, treated C.H. at the hospital, and according to Sexton's notes, C.H. told her the attackers had a small black-handled pistol. Because Sexton failed to note down some of the abrasions C.H. had suffered (as shown in photographs admitted in evidence) and because Sexton

came across to the trial court as a "glum" or reluctant witness, the court did not find her to be credible. But if one considers Sexton to be an unreliable witness, it seems one would have to consider Good to be unreliable, too, for he testified that when he approached C.H. and the assailants fled, C.H. ran to him and said she had been raped and that "they had a gun." C.H. never mentioned a gun in her testimony at trial. That her assailants were armed with a pistol would have been an important fact under any view, and the omission of that fact from her testimony is troubling and inexplicable.

Typically, falsehood reveals itself in the incidental factual representations. A lie becomes more difficult to sustain as the details accumulate. (I am not asserting that C.H. lied. That is not for us to decide. I am merely trying, as fairly as possible, to take account of the evidence on the other side.) C.H. testified that as she was walking down the sidewalk, on her way home from visiting a friend's house, respondent, whom she described as the taller boy, and G.W., whom she described as the shorter boy, asked her if she would like to go behind a house and have a drink. Apparently, the house was where respondent's cousin, Destiny Nesbitt lived. According to C.H.'s testimony, she paused a moment on the sidewalk, and respondent, the taller boy, was idly pressing a button, causing a garage door to go up and down. C.H. testified she declined G.W.'s offer, whereupon G.W. grabbed her and pulled her behind the house and the two boys sexually assaulted her. According to respondent's testimony,

C.H. voluntarily went behind his cousin's house pursuant to her agreement with him and G.W. to have sex with them for $20 apiece. As it turned out, Nesbitt did indeed have a garage adjoining her duplex, but the evidence was unrebutted that the garage had a manual door with no automatic garage-door opener or electric button. The trial court stated: "There would be no reason for C.H. to make that up, and it may well have been a [mis]perception. I don't think anyone is paying careful attention to the mechanism that operates a garage door when the events are on the discussion and what took place." I do not think that all reasonable minds would necessarily be satisfied by this rationalization. It is difficult to understand how C.H. could have misperceived what respondent was doing--she thought she saw him pressing a button, but actually he grasped the handle of the garage door and physically lifted the door and lowered it over and over again? Setting aside the question of why anyone would feel inclined to do that, the physical actions are so different from one another as to make a mistake unlikely. A rational trier of fact could find--would not have to find, but could find--that C.H. made up the electric garage-door opener and made up the black-handled gun and made up the midnight trip to the friend's house and, therefore, made up the sexual assault.

In summary, with respect to the charge of criminal sexual assault, this case turned on credibility, as the majority admits--C.H.'s testimony on the one hand and respondent's testimony on the other--and respondent was not the only witness whose

narrative was plagued by discrepancies, contradictions, and improbabilities.  One could question C.H.'s credibility, too. Therefore, contrary to the majority's assessment, the evidence was closely balanced.

The majority refuses to apply the plain-error doctrine to this case because the evidence on the other count, attempt (robbery), was not closely balanced.  Apparently, in the majority's view, if a defendant were charged with one count of first-degree murder and one count of misdemeanor theft and the evidence were closely balanced on the former count but not on the latter count, review under the doctrine of plain error would be unavailable:  it would not matter that because the evidence of murder was closely balanced, an error might have caused the defendant to be wrongly convicted of that offense--because the evidence that he committed misdemeanor theft was overwhelming.  That approach to plain error cannot logically be sustained.

"When there is error in a close case, we choose to err on the side of fairness, so as not to convict an innocent person."  Herron, 215 Ill. 2d at 193, 830 N.E.2d at 483.  Failing to hold a Boose hearing was error.  See Allen, 222 Ill. 2d at 353, 856 N.E.2d at 356.  For 137 years, courts in this country have recognized that shackles can function as a psychological weapon against the accused.  In the first American shackling case, the Supreme Court of California stated:

> "A prisoner upon his trial in [c]ourt is
> in the custody of the law[] and under the

> immediate control of and subject to the or-
> ders of such [c]ourt.  ***  [A]ny order or
> action of the [c]ourt which, without evident
> necessity, imposes physical burdens, pains
> and restraints upon a prisoner during the
> progress of his trial, inevitably tends to
> confuse and embarrass his mental faculties,
> and thereby materially to abridge and preju-
> dicially affect his constitutional rights of
> defense; and especially would such physical
> bonds and restraints in like manner materi-
> ally impair and prejudicially affect his
> statutory privilege of becoming a competent
> witness and testifying in his own behalf."
> People v. Harrington, 42 Cal. 165, 168
> (1871).

Likewise, the Supreme Court of Missouri has stated:  "[T]he condition of the prisoner in shackles may, to some extent, deprive him of the free and calm use of all his faculties." State v. Kring, 64 Mo. 591, 593 (1877); see also Williams v. State, 629 P.2d 54, 58 n.7 (Ala. 1981); State v. Roberts, 86 N.J. Super. 159, 164, 206 A.2d 200, 203 (1965).  It may be that, physically, restraints are not as painful now as they were a hundred or more years ago (Deck v. Missouri, 544 U.S. 622, 630, 161 L. Ed. 2d 953, 963, 125 S. Ct. 2007, 2012-13 (2005); Kennedy v. Cardwell, 487 F.2d 101, 106 (6th Cir. 1973)), but I am uncon-

vinced that the cases were concerned merely with physical pain. They were concerned with the diminution of the accused's self-respect before the tribunal to which he must make his defense. Courts considered it an abhorrent practice to "'"[bring the defendant] to the [b]ar in a contumelious [m]anner,"'" bearing, on his hands or feet, the "'"[m]ark of [i]gnominy and [r]eproach."'" Deck, 544 U.S. at 630, 161 L. Ed. 2d at 963, 125 S. Ct. at 2013, quoting Roberts, 86 N.J. Super. at 162, 206 A.2d at 202, quoting 2 W. Hawkins, Pleas of the Crown, ch. 28, §1, at 308 (1716-1721) (section on arraignments).

Even in a bench trial, a defendant should not be shackled unless the trial court has good cause to believe that shackles are necessary to keep the courtroom safe or to prevent escape, for unnecessary shackling threatens the dignity of the court. Staley, 67 Ill. 2d at 37, 364 N.E.2d at 73. As a court loses its dignity, it loses credibility with the public (Deck, 544 U.S. at 631, 161 L. Ed. 2d at 964, 125 S. Ct. at 2013); and I further would argue that it loses credibility with the defendant --to the possible detriment of his defense. To do his best at trial, the defendant must have confidence that he is making his case to a rational and impartial trier of fact who genuinely presumes he is innocent until the State proves him to be guilty beyond a reasonable doubt. Unnecessary and unjustified shackling weakens that confidence; it "jeopardizes the presumption's value and protection." Staley, 67 Ill. 2d at 37, 364 N.E.2d at 73. The presumption of innocence is a noble ideal, but this ideal

will inspire little hope if hard iron reminds the defendant, every moment of the trial, how things really are between him and the court--for, plainly, he is not "stand[ing] trial 'with the appearance, dignity, and self-respect of a free and innocent man.'"  Staley, 67 Ill. 2d at 37, 364 N.E.2d at 73, quoting Eaddy v. People, 115 Colo. 488, 492, 174 P.2d 717, 719 (1946).  In addition to defending himself against the State's evidence, a defendant should not have to struggle with a sense of futility, a disheartening suspicion that he is presumed guilty.  Anyone who can sit in chains with no diminution of courage and confidence has a thicker hide than the common run of humanity.  I would find the failure to hold a Boose hearing to be plain error because the evidence was closely balanced.  I would reverse the trial court's judgment and remand this case for a new trial--to be conducted without shackles, unless the trial court holds a Boose hearing and finds a clear need for them.

B. Denial of a Jury Trial

1. The Inapplicability of Fucini, Presley, and G.O.

In rejecting respondent's argument that denying him a jury trial violated due process, the majority begins by citing three cases--Fucini, Presley, and G.O.--all of which are distinguishable because they do not address the specific arguments respondent is making in this appeal.  It is true, as the majority says, that in Fucini, 44 Ill. 2d at 310, 255 N.E.2d at 382, and Presley, 47 Ill. 2d at 55, 264 N.E.2d at 179 (which simply referenced Fucini), the supreme court "held that juveniles have

no right to a jury trial under the Illinois Constitution." Slip op. at 21. But the supreme court decided Fucini and Presley in 1970, and much has changed in the intervening 38 years. The Juvenile Court Act no longer exists. We now have the Juvenile Court Act of 1987, which, in 1999, was amended so as to effect "a fundamental shift from the singular goal of rehabilitation to include overriding concerns of protecting the public and holding juvenile offenders accountable for violations of the law" (Taylor, 221 Ill. 2d at 167, 850 N.E.2d at 139). Also, when the supreme court decided Fucini and Presley, there was no Sex Offender Registration Act (730 ILCS 150/1 through 12 (West 2006)).

As for G.O., it is true, as the majority says, that the supreme court in that case "rejected arguments that the denial of a jury trial to a juvenile charged with first-degree murder violated equal protection or due process." Slip op. at 22-23. But, again, this discussion of G.O. is so general as to be misleading. One must bear in mind the argument the respondent was making in that case. He argued that denying him a jury trial violated due process because the mandatory minimum sentence required by section 5-33(1.5) of the Act (705 ILCS 405/5-33(1.5) (West 1996))--i.e., "commit[ment] to the Department of Corrections, Juvenile Division, until his '21st birthday, without the possibility of parole, furlough, or non[]emergency authorized absence for a period of 5 years'" (G.O., 191 Ill. 2d at 40-41, 727 N.E.2d at 1005)--"render[ed] the process to which [he was]

subject much more punitive than rehabilitative." G.O., 191 Ill. 2d at 44, 727 N.E.2d at 1007. The supreme court rejected respondent's due-process theory in G.O. for the sole reason that the theory rested on a false premise, namely, that there was such a statute as section 5-33(1.5). Actually, that section of the Act was void ab initio because it was part of Public Act 88-680 (Pub. Act 88-680, §5-15, eff. January 1, 1995 (1994 Ill. Laws 2750)), which, in People v. Cervantes, 189 Ill. 2d 80, 98, 723 N.E.2d 265, 274 (1999), the supreme court held to be unconstitutional because the General Assembly had violated the single-subject clause (Ill. Const. 1970, art. IV, §8(d)). G.O., 191 Ill. 2d at 43-44, 727 N.E.2d at 1007. The respondent in G.O. gave the supreme court "no other reason to reexamine [its] earlier decisions" such as Fucini. G.O., 191 Ill. 2d at 44, 727 N.E.2d at 1007.

Significantly, the majority in G.O. stated: "Contrary to Justice Heiple's assertions [in his dissent], we do not hold that a due[-]process argument is foreclosed by Fucini. Instead, we hold that, in the absence of the mandatory sentencing provision, [the] respondent does not ask this court to reconsider Fucini. The argument considered by Justice Heiple is not before this court[,] and we express no opinion [on] its merits." G.O., 191 Ill. 2d at 44 n.3, 727 N.E.2d at 1007 n.3. In this appeal, respondent relies heavily on Justice Heiple's dissent in G.O. and repeats his arguments. It is true that Justice Heiple's dissent is not precedential, but the majority in this case goes further

and concludes that Fucini, Presley, and G.O. dispose of Justice Heiple's arguments (which also are respondent's arguments) when, in fact, the majority in G.O. emphasized it was expressing no opinion, one way or the other, on the merits of Justice Heiple's arguments and disavowed any implication that Fucini foreclosed a due-process challenge along the lines of his dissent.

Thus, the three cases on which the majority chiefly relies in disposing of respondent's due-process theory (Fucini, Presley, and G.O.) really pose no obstacle at all to that theory. Fucini and Presley were decided under a statute that no longer exists, and G.O. rejected a due-process challenge for a narrow reason that has no relevance to this case.

2. Due Process Versus the "Wooden Approach"

The majority concludes that respondent's due-process challenge must fail because despite the 1999 amendments to the Act, proceedings under the Act still are not criminal (A.G., 195 Ill. 2d at 317, 746 N.E.2d at 735; Taylor, 221 Ill. 2d at 168, 850 N.E.2d at 140) and "rehabilitation remains a more important consideration in the juvenile justice system than in the criminal justice system" (Taylor, 221 Ill. 2d at 170, 850 N.E.2d at 141). As long as there is a juvenile justice system with less severe maximum sentences than in the criminal justice system, one never will be able to characterize delinquency proceedings--absolutely and unreservedly--as "criminal"; rehabilitation always will be a somewhat greater consideration in juvenile delinquency proceedings than in criminal proceedings.  Labels should not determine

our disposition of respondent's appeal.  The Supreme Court has said:  "Little, indeed, is to be gained by any attempt simplistically to call the juvenile court proceeding either 'civil' or 'criminal.'  The Court carefully has avoided this wooden approach."  McKeiver, 403 U.S. at 541, 29 L. Ed. 2d at 658, 91 S. Ct. 1984.  Delinquency proceedings are on a continuum between civil and criminal--they partake of aspects of each--and instead of asking whether delinquency proceedings are one or the other, we should be asking whether, in respondent's case, the proceedings were close enough, in their objectives, to the criminal end of the continuum (and far enough away from the State's traditional paternalistic role) as to make it a violation of due process, or fundamentally unfair, to deny him a trial by jury.

I derive the standard of fundamental fairness from McKeiver, a plurality decision by the Supreme Court.  A majority of the Court agreed in that case that trial by jury in a juvenile court's adjudicative stage was not constitutionally required. McKeiver, 403 U.S. at 545, 29 L. Ed. 2d at 661, 91 S. Ct. at 1986.  Justice Blackmun wrote an opinion listing 13 reasons for that holding.  McKeiver, 403 U.S. at 545-51, 29 L. Ed. 2d at 661-64, 91 S. Ct. at 1986-89.  Only three other members of the Court --Chief Justice Burger, Justice Stewart, and Justice White-- joined in Justice Blackmun's opinion.  Justice Harlan concurred in the judgments for the sole reason that, in his view, "criminal jury trials [were] not constitutionally required of the [s]tates, either as a matter of [s]ixth[-][a]mendment law or due process."

McKeiver, 403 U.S. at 553, 29 L. Ed. 2d at 668, 91 S. Ct. at 1992 (Harlan, J., concurring).  No other members of the court shared that view.  Justice Brennan concurred in the judgment in the Pennsylvania cases but dissented in the North Carolina cases (two groups of cases, one group from Pennsylvania and the other from North Carolina, were before the Court).  In his opinion, he did not say he agreed with Justice Blackmun's 13 reasons, but on one point he did explicitly agree with Justice Blackmun's rationale: that due process required "'fundamental fairness *** [in] factfinding.'"  McKeiver, 403 U.S. at 554, 29 L. Ed. 2d at 666, 91 S. Ct. at 1990 (Brennan, J., concurring in part and dissenting in part).

In both Justice Blackmun's opinion and Justice Brennan's opinion (and, therefore, in the view of a majority of the Supreme Court), the fundamental fairness of denying a jury trial in juvenile delinquency proceedings depended largely on the paternalistic and beneficent character of such proceedings. Justice Blackmun was concerned that requiring a jury trial would "remake the juvenile proceeding into a fully adversary process and [would] put an effective end to what has been the idealistic prospect of an intimate, informal protective proceeding." McKeiver, 403 U.S. at 545, 29 L. Ed. 2d at 661, 91 S. Ct. at 1986; see also Fucini, 44 Ill. 2d at 309, 255 N.E.2d at 382. Justice Brennan reasoned as follows:

> "The availability of trial by jury allows an
> accused to protect himself against possible

oppression by what is in essence an appeal to the community conscience, as embodied in the jury that hears his case.  To some extent, however, a similar protection may be obtained when an accused may in essence appeal to the community at large, by focusing public attention upon the facts of his trial, exposing improper judicial behavior to public view, and obtaining, if necessary, executive redress through the medium of public indignation.  Of course, the Constitution, in the context of adult criminal trials, has rejected the notion that public trial is an adequate substitution for trial by jury in serious cases.  But in the context of juvenile delinquency proceedings, I cannot say that it is beyond the competence of a [s]tate to conclude that juveniles who fear that delinquency proceedings will mask judicial oppression may obtain adequate protection by focusing community attention upon the trial of their cases.  For, however much the juvenile system may have failed in practice, its very existence as an ostensibly beneficent and noncriminal process for the care and guidance of young persons demonstrates the

existence of the community's sympathy and
concern for the young.  Juveniles able to
bring the community's attention to bear upon
their trials may therefore draw upon a reser-
voir of public concern unavailable to the
adult criminal defendant."  McKeiver, 403
U.S. at 554-55, 29 L. Ed. 2d at 666, 91 S.
Ct. at 1991 (Brennan, J., concurring in part
and dissenting in part).

Justice Brennan dissented in the North Carolina cases because
North Carolina law either permitted or required the exclusion of
the general public from juvenile trials.  McKeiver, 403 U.S. at
556, 29 L. Ed. 2d at 667, 91 S. Ct. at 1991 (Brennan, J., concur-
ring in part and dissenting in part).

Section 1-5(6) of the Act provides:  "The general
public except for the news media and the crime victim *** shall
be excluded from any hearing and, except for the persons speci-
fied in this [s]ection[,] only persons, including representatives
of agencies and associations, who in the opinion of the court
have a direct interest in the case or in the work of the court
shall be admitted to the hearing."  705 ILCS 405/1-5(6) (West
2006).  Because the general public is excluded from hearings
under the Act and we have held that a trial court, in its discre-
tion, also may exclude the news media (In re a Minor, 205 Ill.
App. 3d 480, 491, 563 N.E.2d 1069, 1076 (1990)), public scrutiny
of the trial court's decision in a juvenile delinquency case

cannot substitute for a jury trial.  Respondent was not able to "draw upon a reservoir of public concern."  See <u>McKeiver</u>, 403 U.S. at 555, 29 L. Ed. 2d at 666, 91 S. Ct. at 1991 (Brennan, J., concurring in part and dissenting in part).

Further, with the 1999 amendments to the Act and the necessity of respondent's having to register as a sex offender as a result of the adjudication of delinquency, it is unclear that "concern," "sympathy," and "paternal attention" were the uppermost values in the proceeding.  <u>McKeiver</u>, 403 U.S. at 550, 29 L. Ed. 2d at 664, 91 S. Ct. at 1989.  As applied to respondent, the process was not "ostensibly beneficent."  <u>McKeiver</u>, 403 U.S. at 555, 29 L. Ed. 2d at 666, 91 S. Ct. at 1991 (Brennan, J., concurring in part and dissenting in part).  In <u>Taylor</u>, 221 Ill. 2d at 165-66, 850 N.E.2d at 138-39, the supreme court gave an overview of the 1999 amendments to the Act:

> "The *** Act was radically altered ***.
> The General Assembly amended the Act with
> Public Act 90-590, effective January 1, 1999.
> 705 ILCS Ann. 405/5-101 <u>et</u> <u>seq</u>. (Smith-Hurd
> 1999).  The amendatory changes renumbered the
> sections and largely rewrote article V of the
> Act to provide more accountability for the
> criminal acts of juveniles and, from all
> appearances, to make the juvenile delinquency
> adjudicatory process look more criminal in
> nature.  Compare 705 ILCS 405/5-1 <u>et</u> <u>seq</u>.

- 50 -

(West 1996) with 705 ILCS 405/5-105 et seq. (West 2000).  For starters, the 1999 amendments provided a new purpose and policy section, which states in relevant part as follows:

'(1) It is the intent of the General Assembly to promote a juvenile justice system capable of dealing with the problem of juvenile delinquency, a system that will protect the community, impose accountability for violations of law[,] and equip juvenile offenders with competencies to live responsibly and productively.  To effectuate this intent, the General Assembly declares the following to be important purposes of this [a]rticle:

(a) To protect citizens from juvenile crime.

(b) To hold each juvenile offender directly accountable for his or her acts.

(c) To provide an

individualized assessment of each alleged and adjudicated delinquent juvenile, in order to rehabilitate and to prevent further delinquent behavior through the development of competency in the juvenile offender.  As used in this [s]ection, "competency" means the development of educational, vocational, social, emotional[,] and basic life skills which enable a minor to mature into a productive member of society.

(d) To provide due process, as required by the Constitution of the United States and the State of Illinois, through which each juvenile offender and all other interested parties

are assured fair hearings at which legal rights are recognized and enforced.

(2) To accomplish these goals, juvenile justice policies developed pursuant to this [a]rticle shall be designed to:

\*\*\*

(b) Provide secure confinement for minors who present a danger to the community and make those minors understand that sanctions for serious crimes, particularly violent felonies, should be commensurate with the seriousness of the offense and merit strong punishment;

(c) Protect the community from crimes committed by minors;

\* \* \*

(j) Hold minors accountable for their

unlawful behavior and not

allow minors to think

that their delinquent

acts have no consequence

for themselves and oth-

ers.'  705 ILCS 405/5-101

(West 2000).

Although proceedings under the Act are still not criminal in nature even in the aftermath of the 1999 amendments and are to be administered in a spirit of humane concern for the minor and to promote his general welfare, the policy statement in section 5-101 represents a fundamental shift from the singular goal of rehabilitation to include the overriding concerns of protecting the public and holding juvenile offenders accountable for violations of the law.  [Citation.]  Consistent with this end, the 1999 amendments changed some of the terminology of the Act.  The Act now provides for a number of features common to a criminal trial.  Pertinent to our analysis are the following provisions.  The legislature has now indicated an intent that the term '"trial" replace the term "adjudicatory hearing" and be

synonymous with that definition as it was used in the [Act].'  705 ILCS 405/5-101(17) (West 1998).  Furthermore, the Act now allows for a 'plea of guilty' in a delinquency proceeding (705 ILCS 405/5-605 (West 1998)), and if a trial is conducted, the court is required, at its conclusion, to 'make and note in the minutes of the proceeding a finding of whether or not the minor is guilty.' (Emphasis added.)  705 ILCS 405/5-620 (West 1998).  If the court finds the minor 'guilty,' the cause then proceeds to a 'sentencing hearing,' where it is determined whether or not it is in the best interests of the minor or the public that he be made a ward of the court, with the possibility that if defendant is adjudicated a ward of the court, he could be committed to the Department of Corrections, Juvenile Division.  705 ILCS 405/5-620, 5-705, 5-710 (West 1998).  In sum, the Act now provides for pleas of guilty, findings of guilty[,] and sentencing ***."

Not only was respondent "tried" under an Act that, since the 1999 amendments, put an increased emphasis on punishment and, as the supreme court said, "look[ed] more criminal in nature," but his commitment to the Juvenile Division of the

- 55 -

Department of Corrections until his twenty-first birthday (an approximate five-year sentence) translates to an even longer sentence when one recognizes that adult offenders earn good-time credits for time served and programs completed. Moreover, the finding of "guilty" of the offense of criminal sexual assault (720 ILCS 5/12-13(a)(1) (West 2004)) resulted in a designation of "sexual predator" within the meaning of section 2(E)(1) (730 ILCS 150/2(E)(1) (West 2004)), requiring respondent to begin registering as a sex offender when he turned 17 (730 ILCS 150/3(a) (West 2004)) and to continue registering for the rest of his life (730 ILCS 150/7 (West 2004)). The State was not acting as a compassionate and sympathetic "parent" when it imposed that requirement on him. Society holds sex offenders in deep abhorrence. See M. Earl-Hubbard, The Child Sex Offender Registration Laws: The Punishment, Liberty Deprivation, and Unintended Results Associated with the Scarlet Letter Laws of the 1990s, 90 NW. U. L. Rev. 788, 824 (1996) ("Authorities have documented numerous instances of vigilantism and attacks on registered offenders in the few years the registration laws have been in effect"); R. Tewksbury, Conversation: Residency Restrictions on Sex Offenders: Exile at Home: The Unintended Collateral Consequences of Sex Offender Residency Restrictions, 42 Harv. C.R.-C.L. L. Rev. 531, 534-35 (2007) (loss or denial of employment, decrease in social interaction, and difficulty finding housing). Being registered as a sex offender is like having the mark of Cain, and it is a mark that respondent will bear to his grave. He will be

"forever kept under the shadow of his crime, forever kept within voice and view of the criminal magistrate, not being able to change his domicile without giving notice to the 'authority immediately in charge of his sur-veillance' ***.  He may not seek, even in other scenes and among other people, to re-trieve his fall from rectitude.  Even that hope is taken from him, and he is subject to tormenting regulations that, if not so tangi-ble as iron bars and stone walls, oppress as much by their continuity ***."  <u>Weems v. United States</u>, 217 U.S. 349, 366, 54 L. Ed. 793, 798, 30 S. Ct. 544, 549 (1910).

Considering what was at stake in this juvenile delinquency proceeding, fundamental fairness required that respondent have a right to a jury trial, and I would reverse the trial court's judgment and remand this case with directions to afford him that right.